**MANNING CURTIS BRADSHAW**
**& BEDNAR PLLC**
Alan C. Bradshaw, #4801
abradshaw@mc2b.com
Christopher M. Glauser, #12101
cglauser@mc2b.com
136 East South Temple, Suite 1300
Salt Lake City, UT 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678

*Attorneys for Plaintiff/Counterclaim Defendant Garden of Life, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARDEN OF LIFE, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>RHEMA HEALTH PRODUCTS INC.,<br><br>      Defendant. | **GARDEN OF LIFE, LLC'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY WITH RESPECT TO COUNTS I AND II AND MEMORANDUM OF LAW IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Case No. 2:16-cv-01222-BCW<br><br>Judge Bruce S. Jenkins |
| RHEMA HEALTH PRODUCTS INC.,<br><br>      Third-Party Plaintiff,<br><br>v.<br><br>TRI-ISO TRYLINE, LLC dba BAOBAB FOODS,<br><br>      Third-Party Defendant. | |

Pursuant to Fed. R. Civ. P. 56 and D.U. Civ. R. 56-1, Plaintiff Garden of Life, LLC submits this Motion for Summary Judgment as to liability on Count I (Breach of Contract) and Count II (Breach of Implied Warranty of Merchantability) of Plaintiff's Complaint.

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................ 1

RELIEF SOUGHT AND GROUNDS THEREFOR ...................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 2

    *The Parties* ................................................................................................................. 2

    *The Agreements Between GOL and Rhema* ............................................................... 3

        (A) Rhema Agreed to Make Raw Meal for GOL ................................................ 3

        (B) Rhema Had Responsibilities Relating to Ingredient Procurement and Supplier
        Selection and Monitoring ................................................................................ 4

        (C) Rhema Warranted That It Would Supply Uncontaminated and Unadulterated Raw
        Meal to GOL ................................................................................................... 5

    *Rhema's Breach of the Agreements* .......................................................................... 5

SUMMARY JUDGMENT STANDARD ........................................................................ 7

ARGUMENT .................................................................................................................... 8

   I.     FLORIDA LAW GOVERNS GOL'S CLAIMS ............................................... 8

   II.    RHEMA BREACHED ITS CONTRACT WITH GOL BY SUPPLYING
        CONTAMINATED AND ADULTERATED PRODUCT (COUNT I) .......... 9

    A.   Rhema Breached the Operative Agreements. .............................................. 10

    B.   GOL Has Suffered Damages. ...................................................................... 12

    C.   Rhema's Purported Defenses Are Immaterial. ........................................... 14

   III.   RHEMA BREACHED THE IMPLIED WARRANTY OF MERCHANTABILITY BY
        SUPPLYING GOL WITH CONTAMINATED AND ADULTERATED PRODUCT
        (COUNT II) ................................................................................................ 17

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alhassid v. Bank of Am., N.A.*,
No. 14-20484-CIV, 2015 WL 11110557 (S.D. Fla. Nov. 4, 2015) .......................................10

*AmeriPath, Inc. v. Wetherington*,
No. 10-60766-CIV, 2011 WL 1303804 (S.D. Fla. Apr. 4, 2011) ............................................7

*Amoroso v. Samuel Friedland Family Enterprises*,
604 So. 2d 827 (Fla. Dist. Ct. App. 1992) ............................................................................18

*Barajas v. Myriad Genetic Labs., Inc.*,
No. 2:13-cv-997, 2014 WL 5681691 (D. Utah Nov. 4, 2014)..................................................9

*Chevron Pipe Line Co. v. Pointe Perry*,
LC, No. 2:08-cv-981, 2011 WL 4565767 (D. Utah Sept. 29, 2011) .......................................9

*Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*,
771 So. 2d 628 (Fla. Dist. Ct. App. 2000) ............................................................................11

*King v. Bray*,
867 So. 2d 1224 (Fla. Dist. Ct. App. 2004) ..........................................................................11

*L-3 Communications Corp. v. E.R. Lewis Transp., Inc.*,
No. 2:04-CV-765, 2005 WL 3591987 (D. Utah Dec. 30, 2005) ............................................7

*Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.*,
941 So. 2d 396 (Fla. Dist. Ct. App. 2006) .......................................................................9, 10

*Miller v. Kase*,
789 So. 2d 1095 (Fla. Dist. Ct. App. 2001) ..........................................................................11

*Nature's Prod., Inc. v. Natrol, Inc.*,
990 F. Supp. 2d 1307 (S.D. Fla. 2013) .................................................................................18

*Nelson v. Holmes Freight Lines*,
37 F.3d 591 (10th Cir. 1994) ..................................................................................................7

*Peacock Const. Co. v. Modern Air Conditioning, Inc.*,
353 So. 2d 840 (Fla. 1977)....................................................................................................11

*S. Bell Tel. & Tel. Co. v. Hanft*,
436 So. 2d 40 (Fla. 1983)................................................................................................10, 15

*S. Crane Rentals, Inc. v. City of Gainesville,*
   429 So. 2d 771 (Fla. Dist. Ct. App. 1983) ...........................................................12

*Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*,
   82 So. 3d 73 (Fla. 2012)..............................................................................................9

*SEB S.A. v. Sunbeam Corp.*,
   148 F. App'x 774 (11th Cir. 2005) ....................................................................10, 15

*Shearson Lehman Bros., Inc. v. M & L Investments*,
   10 F. 3d 1510 (10th Cir. 1993) ..................................................................................8

*UBS Bank USA v. Mullins*,
   No. 2:08-CV-814, 2011 WL 2912805 (D. Utah July 18, 2011) ...............................7

*Wakefield Kennedy, LLC v. Baldwin*,
   No. 11-CV-00604, 2014 WL 910029 (D. Utah Mar. 7, 2014), *aff'd sub nom.*
   *Wakefield Kennedy, LLC v. State Capital Holdings, LLC*, 614 F. App'x 929
   (10th Cir. 2015)..........................................................................................................9

## Statutes and Rules

21 U.S.C. § 331 ....................................................................................................2, 13

21 U.S.C. § 342(a) ...............................................................................................2, 12

21 U.S.C. § 350l....................................................................................................2

Fed. R. Civ. P. 56..................................................................................................7

Fla. Stat. § 672.314 ..............................................................................................18

Fla. Stat. § 672.316 ..............................................................................................19

# INTRODUCTION

This lawsuit arises from the potentially deadly *Salmonella Virchow* contamination of a powdered meal replacement product manufactured by Defendant/Counter-Plaintiff Rhema Health Products Inc. ("Defendant" or "Rhema"). Plaintiff Garden of Life, LLC ("GOL"), a producer and seller of products, including dietary supplement, probiotic, protein, vitamin, and green food products, contracted with Rhema to have it manufacture for GOL a powdered meal replacement product called Raw Meal Organic Shake & Meal Replacement ("Raw Meal"). Under the written contracts between GOL and Rhema, Rhema agreed that it would supply product to GOL that was free from contamination and adulteration and would comply with federal law. When Rhema supplied Raw Meal to GOL that was contaminated with and adulterated by *Salmonella*, Rhema breached this clear obligation. As a result of Rhema's breach, GOL brought this lawsuit. The undisputed facts and law underlying this Motion are straightforward and compel judgment in favor of GOL on the issue of Rhema's liability for breach of contract and breach of implied warranty of merchantability.

In the parties' January 22, 2015 Manufacturing Agreement ("Manufacturing Agreement"), Rhema expressly warranted that the product it supplied to GOL would be "pure and free from adulteration" and would comply with U.S. Food and Drug Administration ("FDA") regulations. *See* Manufacturing Agreement, § IV(1) (attached hereto as Appendix B). However, Rhema admits that it supplied certain lots of Raw Meal to GOL that were contaminated by *Salmonella* and thus unfit for human consumption. Indeed, the contamination was confirmed by several governmental sources, necessitating a product recall. FDA agreed that the recall was Class I—its most severe class of recall—because *Salmonella* contamination creates "a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death." Products containing *Salmonella* are

"adulterated" under federal law and must be recalled.  *See* 21 U.S.C. §§ 331; 342(a); 350l.  As a result of Rhema's supply of contaminated Raw Meal, GOL suffered significant damages, not to mention reputational harm, associated with the recall of the product from the market.

There is no dispute that Rhema supplied GOL with an adulterated and potentially deadly meal replacement product.  This violated Rhema's express contractual covenants and the implied warranty of merchantability.  Accordingly, GOL is entitled to summary judgment as to liability.

## RELIEF SOUGHT AND GROUNDS THEREFOR

GOL seeks a declaration and judgment that Rhema has breached its contractual obligations and its express warranties to GOL under the parties' January 22, 2015 Manufacturing Agreement and December 31, 2014 Quality Agreement ("Quality Agreement"), and its implied warranty of merchantability, by supplying GOL with a contaminated and adulterated meal replacement product (Raw Meal).  GOL also seeks an Order scheduling further proceedings so that damages may be assessed for Rhema's breach.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Parties

1.      GOL sells and markets a variety of products, including dietary supplement, probiotic, protein, vitamin, and green food products.  *See* Compl. ¶ 6, ECF No. 2; Decl. of Jeffrey Brent Brams, Esq. in Supp. of Mot. Summ. J. ¶ 3 (attached hereto as Appendix A).

2.      Rhema formulates, develops, and manufactures health food and dietary supplement products for third parties, including GOL.  *See* Compl. ¶ 8; Rhema's Am. Third-Party Compl. ("Rhema's Am. TP Compl.") ¶ 6, ECF No. 56; App. A ¶ 4.

3.      In the normal course of its business, GOL has contracted with manufacturing companies, including Rhema, to develop, manufacture, and supply GOL with products for sale to consumers.  App. A ¶ 5; Compl. ¶ 6.

***The Agreements Between GOL and Rhema***

(A)     Rhema Agreed to Make Raw Meal for GOL

4.      GOL and Rhema entered into the Manufacturing Agreement on January 22, 2015. *See* App. B; Compl. ¶ 13; Rhema's Second Am. Compl. and Countercl. ("SAAC") ¶ 5, ECF No. 44.

5.      The Manufacturing Agreement incorporated and attached as an exhibit a Quality Agreement, dated December 31, 2014 ("Quality Agreement") (attached hereto as Appendix C). *See* App. B, § III(1); App. C.

6.      The Agreements obligated Rhema to "package and manufacture" products for supply to GOL, for GOL's ultimate distribution.  *See* App. B, § I.

7.      Among the products that Rhema agreed to formulate, manufacture, and package for GOL under the Manufacturing Agreement was a powdered meal replacement product called Raw Meal.  App. A. ¶ 7; Rhema's SAAC ¶ 5; Rhema's Am. TP Compl. ¶ 8.

8.      The Manufacturing Agreement states that "RHEMA shall manufacture and package the Products strictly in accordance with the Finished Goods Specifications and Packaging Specifications and in accordance with the certain QUALITY AGREEMENT . . . by and between RHEMA and GOL."  App. B, § III(1).

9.      The Quality Agreement similarly states that:

> GoL will provide RHEMA with complete finished product and/or bulk product specifications.  If complete specifications have not yet been developed, RHEMA will assist GoL in completing all the specifications required for manufacturing.  In all cases, GoL is the sole owner of the product formula and has full responsibility for safety, efficacy and claims made based on the product formula and specifications.

App. C, § 6.1.

10.     Section 22.1 of the Quality Agreement incorporates by reference a checklist of responsibilities set forth in Exhibit A to the Agreement.  Exhibit A reflects that Rhema and GOL agreed to have "<u>shared</u>" responsibility for "[r]aw ingredient specifications." App. C, Ex. A at § 4a.

11.     As Rhema has acknowledged, the "specifications [for the Raw Meal] required the use of raw moringa oleifera aka moringa leaf powder."  Rhema's SAAC ¶ 8.  That is, Rhema understood and agreed to use raw moringa powder as an ingredient in the Raw Meal it was manufacturing for and supplying to GOL.  *Id.*

(B)     <u>Rhema Had Responsibilities Relating to Ingredient Procurement and Supplier Selection and Monitoring</u>

12.     Rhema also agreed that "RHEMA shall be responsible for securing and purchasing all raw materials from GOL designated and approved suppliers and vendors."  App. B, § II(4).

13.     Indeed, Section 9.1 of the Quality Agreement provides that "RHEMA will procure raw ingredients/packaging components for the purpose of manufacturing product unless otherwise specified in writing by GoL," and that "RHEMA will maintain supplier quality program that encompasses supplier qualification, audits, and supplier performance including maintenance of an approved supplier list."  App. C, § 9.1.  In Section 9.3.1, Rhema further agrees that it will "take the necessary steps to ensure the manufacturing process is in control, including Supplier Qualification."  App. C, § 9.3.1.

14.     Exhibit A to the Quality Agreement also makes clear that "[s]upplier selection" and "[s]upplier approval" were "<u>shared</u>" responsibilities between Rhema and GOL.  App. C, Ex. A at §§ 6a, 6c (emphasis added).

15. Moreover, Exhibit A to the Quality Agreement reflects that Rhema has "full" responsibility—and GOL has "none"—to perform a "[s]upplier audit" (App. C, Ex. A at § 6b) and "[m]onitor supplier performance" (*id.* at § 6d), as well as for "[s]ampling plans" (*id.* at § 5b); "[t]raining of personnel" (*id.* at § 10); "[t]est method qualification" (*id.* at § 4d); and "Finished Goods Certificate of Analysis" (*id.* at § 4f).

(C)    Rhema Warranted That It Would Supply Uncontaminated and Unadulterated Raw Meal to GOL

16. In the Manufacturing Agreement, at § IV(1), Rhema, with full knowledge of the other contractual duties in the contracts, expressly covenanted that it would supply GOL with products that were "pure and free from adulteration." App. B, § IV(1).

***Rhema's Breach of the Agreements***

17. In or about August or September 2015 through January 2016, Rhema manufactured lots of Raw Meal, incorporating moringa powder as an ingredient, and supplied these lots to GOL for GOL's ultimate distribution to retailers and consumers for consumption. App. A ¶¶ 9-10, 16; Rhema's Am. TP Compl. ¶¶ 48-49, 63; *see also* Compl. ¶ 15.

18. On January 28, 2016, the FDA and the United States Centers for Disease Control and Prevention ("CDC") informed GOL that epidemiologic and laboratory evidence indicated that Raw Meal was the likely source of an outbreak of *Salmonella Virchow* infections reported in several states. App. A ¶ 11; Compl. ¶ 16; *see also* Rhema's Am. TP Compl. ¶¶ 42-69.

19. On February 1, 2016, the Utah Public Health Laboratory isolated *Salmonella* from an open container of Raw Meal collected from an infected patient and confirmed that the *Salmonella* isolates from the Raw Meal matched the outbreak strain.[1] App. A ¶ 13; Compl. ¶ 17;

---

[1] *See FDA Investigated Multistate Outbreak of Salmonella Virchow Linked to RAW Meal Organic Shake and Meal Replacement Products*, FDA (Apr. 22, 2016), http://www.fda.gov/Food

*see also* Rhema's Am. TP Compl. ¶ 69.

20.     After extensive sampling and testing of the product and its ingredients, the FDA confirmed the presence of *Salmonella Virchow* in the moringa powder ingredient used in the Raw Meal products Rhema supplied to GOL.  App. A ¶ 14; App. E; Compl. ¶ 18; Rhema's Am. TP Compl. ¶ 69; *see also* Rhema's SAAC ¶¶ 89-91, 94.

21.     *Salmonella* in the Raw Meal rendered the product adulterated under federal law. *See* 21 U.S.C. § 342.

22.     Rhema admits that it supplied the contaminated and adulterated Raw Meal to GOL.  *See* Rhema's Am. TP Compl. ¶¶ 42-70; *see also* Rhema's SAAC ¶¶ 89-91, 94.

23.     Upon learning of the contamination, GOL promptly issued two product recalls, on January 29, 2016, and February 12, 2016, in order to protect public health.[2]  App. A ¶¶ 11-16; *see* Compl. ¶ 19; Rhema's Am. TP Compl. ¶ 68.

24.     In recalling the Raw Meal, GOL incurred significant damages, including, but not limited to, millions of dollars in associated expenses and reputational harm.  App. A ¶ 18.

25.     The recalls covered sixty-one lots of Raw Meal products supplied by Rhema that were at risk of causing serious injury or death due to the presence of *Salmonella*.  App. A ¶ 16.

26.     Rhema admits that the Raw Meal it supplied to GOL was contaminated with *Salmonella*, and Rhema asserts that the Raw Meal was adulterated by the product's moringa powder ingredient, which was itself contaminated by *Salmonella*.  Rhema's SAAC ¶¶ 91-94.

---

/RecallsOutbreaksEmergencies/Outbreaks/ucm484187.htm#complications, attached hereto as Appendix E.

[2] *Garden of Life, LLC Recalls Raw Meal Organic Shake & Meal Products Because of Possible Health Risk*, FDA (Jan. 29, 2016), https://www.fda.gov/Safety/Recalls/ucm484027.htm, attached hereto as Appendix D; *Garden of life Expands Voluntary Recall to Include Additional Lots of Raw Meal Products Due to Possible Salmonella Contamination*, FDA (Feb. 13, 2016), http://www.fda.gov/Safety/Recalls/ucm486234.htm, attached hereto as Appendix F.

27.    Rhema alleges that its supplier of the contaminated moringa powder ingredient was Tri-Iso Tryline LLC (d/b/a Baobab Foods) ("Baobab"), with whom Rhema is in contractual privity.  Rhema's SAAC ¶ 38; Rhema's Am. TP Compl. ¶ 70.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of an alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment."  *Nelson v. Holmes Freight Lines*, 37 F.3d 591, 594 (10th Cir. 1994).  Additionally, summary judgment may be granted as to all or part of any claim or defense.  *See* Fed. R. Civ. P. 56(a).

Summary judgment is appropriate on contract claims where, as here, the contract is clear and the breach cannot reasonably be disputed.  *L-3 Communications Corp. v. E.R. Lewis Transp., Inc.*, No. 2:04-CV-765, 2005 WL 3591987, at *3 (D. Utah Dec. 30, 2005) (granting motion for partial summary judgment on breach of contract claim where the defendant breached the contract by damaging a machine that it was required to transport and deliver under the contract); *UBS Bank USA v. Mullins*, No. 2:08-CV-814, 2011 WL 2912805 (D. Utah July 18, 2011) (granting bank's breach of contract and account stated claims, including damages in amount of unpaid amount of loan and attorney fees and costs).[3]

---

[3] Summary judgment on liability is appropriate regardless of whether the amount of damages remains in dispute.  *See AmeriPath, Inc. v. Wetherington*, No. 10-60766-CIV, 2011 WL 1303804, at *5 (S.D. Fla. Apr. 4, 2011) ("A plaintiff moving for summary judgment as to liability only does not need to prove the specific amount of damages to prevail. . . . Conflicting evidence as to amount of damages does not raise a genuine issue as to liability. . . . The plaintiff only needs to prove *some* amount of damage." (citing *Flamingo Hotel Co. v. Jay Glynn Tax Advisor Co.*, 170 So. 2d 78, 79 (Fla. Dist. Ct. App. 1964) and *City of Miami Beach, Fla. v. Carner*, 579 So. 2d 248, 253 (Fla. Dist. Ct. App. 1991))).

## ARGUMENT

This lawsuit involves a straightforward fact pattern: a supplier of a powdered meal replacement product supplied a dangerous product that was contaminated and adulterated in violation of the supplier's contractual obligations and federal law. This breached the express covenants of the Manufacturing Agreement, as well as the implied warranty of merchantability. The contamination and adulteration was such that it necessitated a Class I recall under FDA regulations, the most serious level of recall, reserved only for those products "capable of causing serious injury or death."[4] Accordingly, the purchaser and reseller of the product, GOL, had no choice but to recall it, at great expense. GOL can thus prove beyond any dispute of material fact each element of its claims—that Rhema breached a valid and binding contract, resulting in damages to GOL, and that Rhema supplied GOL with products with a defect rendering them unfit for human consumption. GOL is therefore entitled to summary judgment as to liability.

## I.    FLORIDA LAW GOVERNS GOL'S CLAIMS

The Manufacturing Agreement contains the following choice of law provision: "This Agreement is governed by and shall be construed in accordance with the Law of Florida." App. B, § X.

In diversity cases such as this one, the District of Utah applies Utah choice of law principles in deciding whether to enforce a contract provision that selects the applicable law. *See Shearson Lehman Bros., Inc. v. M & L Investments*, 10 F.3d 1510, 1514 (10th Cir. 1993) ("In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting.") (applying Utah law to determine

---

[4] *See* Recalls, Market Withdrawals, & Safety Alerts, *Background and Definitions*, FDA (updated June 24, 2009), https://www.fda.gov/Safety/Recalls/ucm165546.htm, attached hereto as Appendix G.

enforceability of New York choice of law provision).

Under Utah law, the parties' selection of applicable law in a contract will be honored by the courts so long as that selection is not unreasonable. *Barajas v. Myriad Genetic Labs., Inc.*, No. 2:13-cv-997, 2014 WL 5681691, at *2 (D. Utah Nov. 4, 2014) ("Utah enforces such choice-of-law provisions, except where to do so would be unreasonable." (citing *Deer Crest Assocs. I, LC v. Silver Creek Dev. Grp., LLC*, 222 P.3d 1184, 1187-88 (Utah Ct. App. 2009))).[5] Here, sophisticated parties chose Florida law to govern their contracts and that choice was not unreasonable, particularly since the purchaser—GOL—is headquartered in Florida.[6] *See* App. A ¶ 2. Accordingly, Florida law governs GOL's claims for breach of contract and breach of warranty.

## II. RHEMA BREACHED ITS CONTRACT WITH GOL BY SUPPLYING CONTAMINATED AND ADULTERATED PRODUCT (COUNT I)

There is no genuine dispute of fact preventing this Court from finding Rhema liable for breach of contract under Florida law. To establish a breach of contract, Florida law requires that a plaintiff establish: "(1) a valid contract; (2) a material breach; and (3) damages." *Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.*, 941 So. 2d 396, 398 (Fla. Dist. Ct. App. 2006) (internal

---

[5] *See also Chevron Pipe Line Co. v. Pointe Perry, LC*, No. 2:08-cv-981, 2011 WL 4565767, at *1 (D. Utah Sept. 29, 2011) ("In general, Utah courts enforce contractual choice of law provisions." (citing *Jacobsen Constr. Co. v. Teton Builders*, 106 P.3d 719, 723 n.2 (Utah 2005))). Further, under Utah law, "[t]here is a reasonable basis to apply [the law of a particular jurisdiction] when a party's princip[al] place of business is in such jurisdiction." *Wakefield Kennedy, LLC v. Baldwin*, No. 11-CV-00604, 2014 WL 910029, at *5 (D. Utah Mar. 7, 2014), *aff'd sub nom. Wakefield Kennedy, LLC v. State Capital Holdings, LLC*, 614 F. App'x 929 (10th Cir. 2015) (internal quotation marks omitted).

[6] Florida law enforces contractual choice of law provisions provided they do not "contravene a strong public policy" of Florida. *Se. Floating Docks, Inc. v. Auto-Owners Ins. Co.*, 82 So. 3d 73, 80 (Fla. 2012). Here, enforcing the parties' selection of Florida law would not contravene a public policy of Florida. Accordingly, the parties' selection of Florida law would be enforced under Florida law.

quotations omitted) (reversing grant of summary judgment in favor of defendant and holding that defendant breached a contract and the implied covenant of good faith based on the undisputed facts and the parties' agreement); *accord Alhassid v. Bank of Am., N.A.*, No. 14-20484, 2015 WL 11110557, at *6 (S.D. Fla. Nov. 4, 2015) (applying Florida law). Contract liability under Florida law is strict liability. "It [i]s immaterial to [a] breach of contract action whether the breach was committed intentionally, negligently, or because of circumstances entirely beyond the defendant's control." *S. Bell Tel. & Tel. Co. v. Hanft*, 436 So. 2d 40, 42 (Fla. 1983); *see also SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005) ("A party's motive is irrelevant to a breach of contract claim under Florida law."). As further discussed below, each of the elements of GOL's breach of contract claim is established beyond reasonable dispute.

### A. Rhema Breached the Operative Agreements.

It is beyond reasonable dispute that Rhema materially breached its obligations under valid agreements between GOL and Rhema. As an initial matter, the existence of a valid and binding contract cannot seriously be disputed.[7] Rhema has extensively cited and relied on the Manufacturing and Quality Agreements throughout its pleadings, briefing, and oral argument to this Court. *See, e.g.*, Rhema's SAAC ¶¶ 5-7, 11-16, 18-23, 36-37, 99-107, 114, 116, 118, 121-25, 127-29. These agreements governed the sale of Raw Meal from Rhema to GOL and unambiguously required Rhema to supply an uncontaminated and unadulterated product that was fit for human consumption—not product having the potential to cause serious injury or death. Specifically, the Manufacturing Agreement mandated that Rhema supply GOL with products that were "pure and free from adulteration." App. B, § IV(1).

---

[7] *See also infra* Section II.C.

The words "pure and free from adulteration" are clear and unambiguous here, and admit no interpretation that might contemplate or condone the supply of *Salmonella*-contaminated products.[8] *Miller v. Kase*, 789 So. 2d 1095, 1097-98 (Fla. Dist. Ct. App. 2001) (ambiguity exists only where contract is susceptible to two different but reasonable interpretations). Common sense dictates that where, as here, a manufacturer expressly covenants to provide meal replacement products that are "pure and free from adulteration" to a commercial party for sale to consumers, that manufacturer breaches its obligation by supplying products that are contaminated with potentially lethal bacteria requiring a recall. Any other interpretation of the contract would be unreasonable and illogical. *See King v. Bray*, 867 So. 2d 1224, 1227 (Fla. Dist. Ct. App. 2004) ("[C]ourts generally agree that where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner.").

Moreover, "adulteration" is not only a term of art in the food and dietary supplement industry, it is clearly defined by federal law. Any claimed lack of clarity as to the meaning of "pure and free from adulteration" in this context is easily dispelled by the Food, Drug and Cosmetic Act ("FDCA"), which regulates food products and unmistakably defines "adulterated" to include to *Salmonella*-infected products. *See Westside EKG Assocs. v. Found. Health*, 932 So.

---

[8] The interpretation of an unambiguous contract is a matter of law for the Court to decide. *See Peacock Const. Co. v. Modern Air Conditioning, Inc.*, 353 So. 2d 840, 842 (Fla. 1977) ("[T]he general rule is that interpretation of a document is a question of law rather than of fact."); *see also Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So. 2d 628, 631 (Fla. Dist. Ct. App. 2000) ("It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties. . . . Where contracts are clear and unambiguous, they should be construed as written, and the court can give them no other meaning." (internal citations omitted)). Accordingly, claims for breach of contract are often resolved through motions for summary judgment, at least as to the issue of liability. *See, e.g.*, *Khosrow Maleki, P.A.*, 771 So. 2d at 631 (reversing trial court judgment and directing entry of summary judgment in favor of plaintiff on breach of contract and implied covenant claims).

2d 214, 216 (Fla. Dist. Ct. App. 2005), *approved*, 944 So. 2d 188 (Fla. 2006) ("It is an accepted principle of law that when parties contract upon a matter which is the subject of statutory regulation, the parties are presumed to have entered into their agreement with reference to such statute, which becomes a part of the contract . . . ."); *see also Smith v. Reverse Mortg. Sols., Inc.*, 200 So. 3d 221, 227 (Fla. Dist. Ct. App. 2016), *reh'g denied* (Oct. 17, 2016) ("We are compelled to construe a contract consistent with specific statutes that regulate and govern the contract." (citing *Westside EKG Assocs.*, 932 So. 2d at 216)); *S. Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 773 (Fla. Dist. Ct. App. 1983) ("The laws which exist at the time and place of the making of a contract enter into and become a part of the contract made, as if they were expressly referred to and incorporated in its terms . . . ."). The FDCA provides, and at the time of the contract provided, that "[a] food shall be deemed to be adulterated . . . [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health" or that "is otherwise unfit for food. . . ." 21 U.S.C. § 342(a). An ingestible product that is dangerous and capable of causing severe sickness or even death is not "pure and free from adulteration." Nor is there any factual debate about whether Rhema supplied contaminated and adulterated products—Rhema admits that it manufactured and supplied the contaminated and adulterated Raw Meal to GOL. *See* Rhema's Am. TP Compl. ¶¶ 42-69; Rhema's SAAC ¶¶ 89-91, 94.

In summary, Rhema plainly breached its commitment to provide Raw Meal that is "pure and free from adulteration" to GOL when it supplied GOL with Raw Meal contaminated with and adulterated by the *Salmonella Virchow* bacterium.

### B.     GOL Has Suffered Damages.

Although GOL seeks summary judgment only as to liability and need not set forth its precise damages in this Motion, there can be no dispute of fact that GOL suffered substantial damages as a direct and foreseeable result of Rhema's breach of contract.

As noted above, <u>three</u> different governmental bodies confirmed that the Raw Meal product that Rhema supplied was contaminated with and adulterated by *Salmonella Virchow*. On January 28, 2016, the FDA and CDC informed GOL that epidemiologic and laboratory evidence identified the Raw Meal products that Rhema had supplied to GOL as the likely source of an outbreak of *Salmonella Virchow* infections reported in several states. App. A ¶ 11. On February 1, 2016, the Utah Public Health Laboratory isolated *Salmonella* from an open container of Raw Meal collected from an infected patient and confirmed that the *Salmonella* isolates from the Raw Meal matched the outbreak strain. App. A ¶ 13. The FDA also conducted extensive sampling and testing, and confirmed the presence of *Salmonella Virchow* in an ingredient (moringa powder) used in the Raw Meal products Rhema had supplied to GOL. App. A ¶ 14.

In light of these findings, GOL faced no choice but to recall the Raw Meal products from shelves.[9] The FDCA expressly prohibits the "adulteration" of food products and the manufacture and introduction of "adulterated" food products into interstate commerce. *See* 21 U.S.C. § 331. To have left the contaminated and adulterated product available to consumers not only would have violated federal law, and been unconscionable, but it also would have potentially exposed GOL, and necessarily Rhema, to vastly expanded damages. GOL thus undertook the costly and embarrassing but necessary and mitigating step of recalling all of the Raw Meal product produced by Rhema using the contaminated lots of moringa powder.

Although the amount of damages will be demonstrated at a later stage, there can be no doubt that GOL suffered actual, compensable, and substantial damages flowing directly from Rhema's breach of the Manufacturing Agreement and failure to comply with federal law.

---

[9] Indeed, the presence of *Salmonella* resulted in FDA agreeing that GOL's recall should be classified as a Class I recall because there was "reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death." *See* App. G.

## C. Rhema's Purported Defenses Are Immaterial.

In its SAAC, Rhema purports to raise various assertions as to why it should be able to avoid its contractual obligations, including claims to the effect that the contracts should be deemed unenforceable. Rhema, however, has left no room to challenge the validity of the contracts, as both Rhema and GOL have pled away any reasonable alternative. As the Court noted in this case, Rhema has "acknowledge[d] the existence of the written document, and in effect [said] [Rhema] compl[ied] with what the arrangement was under the writing." Mot. Dismiss Hr'g Tr. 17:22-25, Aug. 23, 2017, attached hereto as Appendix H. Rhema has also relied on the contracts not only in asserting its first cause of action (Breach of Contract) and second cause of action (Breach of Duty of Good Faith and Fair Dealing), but also in opposing GOL's initial motion to dismiss[10] and in asserting its Amended Third Party Complaint against the supplier of moringa powder[11]. Having relied so heavily on contending that binding contracts exist, Rhema cannot be heard to challenge the contracts' validity.

Regardless, Rhema's specific arguments as to why it should be permitted to avoid its contractual obligations are without merit. First, Rhema contends that it cannot be liable to GOL because Rhema was not at fault, either because Rhema did not willfully contaminate or adulterate the Raw Meal or because it employed testing procedures that it asserts are reasonable

---

[10] *See* Opp. Mot. Dismiss 1-4 (citing contractual provisions), 5-6 (arguing that GOL owes Rhema a duty because "the parties have a contractual relationship" and the parties' conduct is governed "under the terms of the parties' agreements"), May 8, 2017, ECF No. 31.

[11] *See, e.g.*, Rhema's Am. TP Compl. ¶ 7 ("In January 2015, Rhema and Garden of Life ('GOL') entered into a manufacturing agreement (the 'Manufacturing Agreement') whereby Rhema agreed to manufacture for GOL certain products on a white label basis."); *id.* at ¶ 9 ("The specifications for the Raw Meal stipulated by GOL under the Manufacturing Agreement required the use of raw organic *moringa oleifera* also referred to as moringa leaf powder . . . as an ingredient."); *id.* at ¶ 10 ("The Manufacturing Agreement required Rhema to use only raw material suppliers selected and approved by GOL.").

or complied with FDA guidelines. Even assuming this to be true, it makes no difference. In Florida, as elsewhere, contract liability is strict liability. A party is liable for a breach even if the breach "was committed intentionally, negligently, or because of circumstances entirely beyond the defendant's control." *S. Bell Tel. & Tel. Co.*, 436 So. 2d at 42; *cf. SEB S.A.*, 148 F. App'x at 790 ("A party's motive is irrelevant to a breach of contract claim under Florida law.").[12] Thus, Rhema's mental state and its diligence (or lack thereof) never enters into the picture. Having covenanted to supply pure and unadulterated Raw Meal, Rhema is liable for supplying contaminated and adulterated Raw Meal, even if the failure is claimed to be through no fault of Rhema—which GOL denies.[13]

Relatedly, Rhema suggests that it should not be contractually liable for supplying contaminated and adulterated Raw Meal to GOL because Rhema obtained the contaminated and adulterated component of the Raw Meal product from a supplier that GOL had selected. *See* Rhema's SAAC ¶¶ 38-40. There are at least three separate reasons why Rhema cannot prevail on this argument. First, as noted above, the issue is not whether Rhema is at fault, but whether it

---

[12] GOL asserts in its Complaint that Rhema is also liable for other contractual breaches, including failure to satisfy other manufacturing standards for Raw Meal required under the Manufacturing Agreement and Quality Agreement. However, as Rhema is liable for providing GOL with contaminated Raw Meal regardless of these other breaches, GOL has not included them as a basis for this motion, and a ruling in favor of GOL on this summary judgment motion would render them moot. Similarly, GOL's claim of breach of the implied covenant of good faith and fair dealing (Count III) is not asserted on this motion and would likely be mooted by judgment in favor of GOL on its other claims.

[13] Similarly, the fact that the Quality Agreement provided specific manufacturing and testing protocols does not excuse Rhema from the overarching covenant to supply pure and unadulterated Raw Meal. Had the parties intended those protocols to absolve Rhema of any further responsibility, they could have clearly said so, or drafted § IV(1) of the Manufacturing Agreement so as not to include a covenant as to the nature of the finished goods Rhema would supply. In other words, the parties' contracts placed on Rhema <u>both</u> the burden of meeting the specified testing regimen <u>and</u> delivering a finished meal replacement product that was pure, unadulterated, and fit for human consumption.

supplied the pure and unadulterated Raw Meal it guaranteed to supply.  Second, as Exhibit A to the Quality Agreement makes clear, "[s]upplier selection" and "[s]upplier approval" were <u>shared</u> responsibilities between Rhema and GOL (App. C, Ex. A at §§ 6a, 6c) and Rhema has "full" responsibility for critical steps such as "[s]upplier audit[ing]" (*id.* at § 6b) and "[m]onitor[ing] supplier performance" (*id.* at § 6d).[14]  Accordingly, Rhema cannot use the initial selection, let alone the continued use of, the supplier of moringa powder (Baobab), as a reason to escape Rhema's contractual obligation to make and provide GOL with Raw Meal free from contamination.  Third, as Rhema had the <u>sole</u> responsibility for auditing and monitoring suppliers (App. C, Ex. A at §§ 6b, 6d), it was <u>Rhema's</u> obligation to ascertain whether there were any problems with Baobab.  These defenses are no defenses at all, and the parties agreements place the duties that Rhema asserts onto it, not onto GOL.

Rhema also contends that it was unreasonable to use moringa powder as an ingredient in the Raw Meal because, according to Rhema, raw moringa powder is highly likely to result in contamination that Rhema's testing could not detect.  *See, e.g.*, Rhema's SAAC ¶¶ 81-82.  Whether true or not, Rhema nonetheless elected to give a warranty as to the product's unadulterated state.  The parties allocated the risks between them in their agreements, and Rhema cannot now ask the Court to undo their bargain.  Even if moringa powder were a highly dangerous ingredient,[15] and even if GOL were aware of that fact, it could not excuse Rhema from contractual liability because Rhema, as a manufacturer of health products using moringa

---

[14] Whether and to what extent Rhema has recourse against the third party supplier that provided contaminated moringa powder is a matter to be addressed separately, under Rhema's Third Party Complaint.  As between GOL and Rhema, however, the parties' contract plainly allocated responsibility for the purity and quality of the product to Rhema.

[15] Moringa powder is not a highly dangerous ingredient—it is a very common protein source that has been used as an ingredient within ingestible products around the world.  *See* App. A ¶ 8.

powder, <u>agreed</u> to make and provide GOL with uncontaminated and unadulterated Raw Meal made with raw moringa powder. Rhema held itself out to GOL as a manufacturer of meal replacement powder products that could use moringa powder to make and supply to GOL Raw Meal that was "pure and free from adulteration." Therefore, Rhema cannot reasonably claim— and indeed, should be estopped from claiming—that it lacked sufficient knowledge to make this warranty.[16]

In short, Rhema cannot dodge its contractual responsibility by arguing claimed "facts" that are irrelevant to this Motion. It undertook to supply pure and unadulterated Raw Meal made with moringa powder that was fit for human consumption. It failed at this undertaking. It is therefore liable to GOL under the parties' contracts.

## III. RHEMA BREACHED THE IMPLIED WARRANTY OF MERCHANTABILITY BY SUPPLYING GOL WITH CONTAMINATED AND ADULTERATED PRODUCT (COUNT II)

Not only did Rhema breach an express covenant concerning the quality of the ingestible products it would supply, but it also breached the warranty of merchantability implied in the sales contract between the parties. This breach independently renders Rhema liable for the contaminated and adulterated Raw Meal it supplied to GOL.

Under Florida law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Fla. Stat. § 672.314(1). To be "merchantable," Florida Statute § 672.314(2) provides that goods must, among other things, be "fit for the ordinary purposes for which such goods are used[.]" A

---

[16] Rhema also seeks to evade its contractual obligations by suggesting that GOL was aware of additional testing procedures that might have mitigated the risk of contamination. *See, e.g.*, SAAC ¶ 77. GOL's knowledge or lack thereof is not relevant to Rhema's performance obligations, and, in any event, Rhema's argument is contrary to the Agreements, which place responsibility for testing and ingredient management squarely upon Rhema, not GOL. App. B, § II(4); App. C, § 9.3.; App. C, Ex. A at §§ 4d, 4f, 5b, 6b, 6d, 10.

plaintiff must establish the following elements to prove liability for breach of this implied warranty: "(1) That the plaintiff was a foreseeable user of the product. (2) That the product was being used in the intended manner at the time of the injury; (3) That the product was defective when transferred from the warrantor; (4) That the defect caused the injury." *Amoroso v. Samuel Friedland Family Enterprises*, 604 So. 2d 827, 833 (Fla. Dist. Ct. App. 1992), *approved*, 630 So. 2d 1067 (Fla. 1994); *accord Nature's Prod., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1321 (S.D. Fla. 2013).[17]

As an initial matter, Rhema is a seller of goods of the kind it supplied to GOL. *See* Compl. ¶ 8; Rhema's Am. TP Compl. ¶ 6 ("Rhema manufactures health food products for third party brands . . . ."). As such, a warranty of merchantability was implied in the parties' agreement for the supply of Raw Meal. The undisputed facts compel the conclusion that Rhema breached this implied warranty because (1) GOL was a foreseeable user of the Raw Meal it purchased from Rhema—indeed, GOL was Rhema's customer[18]; (2) GOL used the Raw Meal Rhema provided for its intended purpose—i.e., GOL's sale to consumers for their ultimate use and consumption[19]; (3) the Raw Meal Rhema provided to GOL was defective when it was transferred from Rhema, as it was contaminated with and adulterated by *Salmonella*, rendering it

---

[17] As with breach of contract claims, summary judgment is appropriate for liability where the breach is clear, even if precise damages have not yet been proven or are disputed. *See, e.g.*, *Nature's Prod., Inc.*, 990 F. Supp. 2d at 1321, 1323-24 (granting summary judgment on liability for breach of implied warranty of merchantability despite that damages were disputed); *see also* Fla. R. Civ. P. 1.510(c) ("A summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.").

[18] *See generally* App. B; *see also* App. A ¶¶ 3-7; Compl. ¶¶ 6, 8; Rhema's Am. TP Compl. ¶¶ 6-8.

[19] *See* App. A ¶¶ 10-16; Rhema's Am. TP Compl. ¶¶ 6-8, 63; *see also* Compl. ¶¶ 15-23.

unfit for human consumption[20]; and (4) the contaminated and adulterated Raw Meal Rhema supplied to GOL caused GOL injuries including, but not limited to, the costs of the contaminated product and those associated with recalling it[21]. Notably, the parties' agreements do not disclaim the warranty of merchantability or any other implied warranties.[22]

In its SAAC, Rhema asserts the following defense to GOL's claim for breach of the implied warranty of merchantability:

> The implied warranty of merchantability may be displaced by the express warranty that the goods will comply with the specifications or by the parties' course of dealing or course of performance. Fla. Stat. Ann. §§ 672.316 and 672.317.

SAAC, Twentieth Defense. However, the implied warranty of merchantability was not displaced here, and the argument makes no sense.[23] The implied warranty of merchantability here is that a product manufactured by Rhema for human consumption would be fit for human consumption. The displacement of this warranty would mean that that GOL and Rhema had <u>agreed</u>—expressly or through the course of their performance—that Rhema could place a contaminated and adulterated meal replacement product into the stream of commerce. The parties obviously

---

[20] *See* App. A ¶¶ 9-17; App. D-G; Compl. ¶¶ 15-19; Rhema's Am. TP Compl. ¶¶ 42-74; Rhema's SAAC ¶¶ 38, 89-97.

[21] *See* App. A ¶¶ 11-18; Rhema's Am. TP Compl. ¶¶ 42-63, 67-74; *see also* Rhema's SAAC ¶¶ 92-97; App. D-G.

[22] Florida Statute § 672.316(2) provides in relevant part that, "to exclude or modify the implied warranty of merchantability or any part of it, the language [of the contract] must mention merchantability and in case of a writing must be conspicuous . . . ." The agreements here contain no such exclusion or modification.

[23] Rhema's argument appears to be that GOL authorized a higher level of coliforms than was contained in the original specification for moringa powder. *See* Rhema's SAAC ¶¶ 59-61. However, Rhema does not and cannot in good faith allege that GOL authorized Rhema to supply GOL with Raw Meal that was contaminated with <u>*Salmonella*</u>.

agreed to no such thing which would be unconscionable, and it should go without saying that there is no evidence to support it.

The circumstances here are tailor-made for the warranty of merchantability. Rhema supplied a meal replacement product that could cause serious injury or even death. The Raw Meal Rhema manufactured could not be have been used for its intended purpose—safe human consumption. Accordingly, GOL is entitled to judgment that Rhema breached the implied warranty of merchantability.

## CONCLUSION

For the foregoing reasons, Plaintiff GOL is entitled to summary judgment on the issue of liability in connection with its claims against Defendant Rhema for breach of contract (Count I) and breach of the warranty of merchantability (Count II).

Dated: December 20, 2017

Respectfully submitted,

MANNING CURTIS BRADSHAW & BEDNAR PLLC

/s/ Christopher M. Glauser
Alan C. Bradshaw
Christopher M. Glauser

Jeffrey A. Simes (*pro hac vice*)
Joanne M. Gray (*pro hac vice*)
Michael K. Murray (*pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Phone: (212) 813-8800
Fax: (212) 355-3333
JSimes@goodwinlaw.com
JGray@goodwinlaw.com
Mmurray@goodwinlaw.com

Amanda H. Russo (*pro hac vice*)
GOODWIN PROCTER LLP

901 New York Avenue N.W.
Washington, DC  20001
Phone: (202) 346-4000
Fax: (202) 346-4444
ARusso@goodwinlaw.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Garden of Life, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **GARDEN OF LIFE, LLC'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY WITH RESPECT TO COUNTS I AND II AND MEMORANDUM OF LAW IN SUPPORT** to be served in the method indicated below to the below-named parties this 20th day of December, 2017.

| | |
|---|---|
| \_\_\_HAND DELIVERY<br>\_\_\_U.S. MAIL<br>\_\_\_FAX TRANSMISSION<br>\_\_\_E-MAIL TRANSMISSION<br> x  CM/ECF | Heather L. Thuet<br>Bryson R. Brown<br>CHRISTENSEN & JENSEN, P.C.<br>257 East 200 South, Suite 1100<br>Salt Lake City, UT 84111<br>Heather.Thuet@chrisjen.com<br>Bryson.Brown@chrisjen.com<br><br>*Attorneys for Defendant/Counterclaim Plaintiff Rhema Health Products, Inc.*<br><br>Ryan Atkinson<br>STRONG & HANNI<br>102 South 200 East, Suite 800<br>Salt Lake City, UT 84111<br>ratkinson@strongandhanni.com<br><br>*Attorney for Third-Party Defendant Tri-Iso Tryline, LLC  dba Baobab Foods* |

/s/ Christopher M. Glauser
Christopher M. Glauser