Heather L. Thuet, #10106
Bryson R. Brown, #14146
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile: (866) 562-7506
Heather.Thuet@chrisjen.com
Bryson.Brown@chrisjen.com
*Attorneys for Defendant and Third-Party Plaintiff Rhema Health Products Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARDEN OF LIFE, LLC,<br><br>　　　　Plaintiff,<br><br>v.<br><br>RHEMA HEALTH PRODUCTS INC.,<br><br>　　Defendant. | **RHEMA HEALTH PRODUCTS, INC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COUNT II CLAIM FOR BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY, FLA CODE §§ 672.314-672.316** |
| RHEMA HEALTH PRODUCTS INC.,<br><br>　　Third-Party Plaintiff,<br><br>v.<br><br>TRI-ISO TRYLINE, LLC dba BAOBAB FOODS,<br><br>　　Third-Party Defendant. | Case No. 2:16-cv-01222-BSJ<br><br>Judge Bruce S. Jenkins |

## TABLE OF CONTENTS

I.  INTRODUCTION AND RELIEF SOUGHT ........................................................ 1

II.  BACKGROUND ........................................................................................... 2

    A.  GOL hired Rhema to help it manufacture a dietary supplement. ..................... 2

    B.  GOL had knowledge and experience with moringa, which was an integral component of two of its products already on the market, as well as a long-established relationship with Baobab, before it came to Rhema. ................................................................... 4

    C.  Rhema's limited manufacturing warranty provided it would manufacture product according to GOL's formula and specifications: GOL retained sole responsibility for its formula and specifications and GOL retained choice of vendors. ..................... 4

    D.  GOL provided the post-agreement specification to use untreated moringa from Baobab in place of treated moringa from NP Nutra. ................................................... 5

    E.  Using untreated moringa creates substantial risks of pathogenic contamination. ............ 6

    F.  GOL eventually consented to Baobab's repeated requests to use a kill step on the moringa, but only after some of the allegedly contaminated moringa had been incorporated into finished product. ................................................................... 8

    G.  GOL only recalled product that contained untreated moringa from Baobab. ................. 9

    H.  GOL's claim for breach of the implied warranty of merchantability, Fla. Code §§ 672.314-672.316. ................................................................................ 9

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................... 11

    A.  The express manufacturing warranty required Rhema to comply with GOL's specifications and made GOL responsible for safety hazards arising from its formula and specifications. ........................................................................................ 11

    B.  GOL specified that the moringa should not be subjected to a "kill step." ...................... 13

    C.  GOL subsequently continued to exercise control over the moringa specifications and processes. ....................................................................................... 14

    D.  Months before the recall, GOL concealed information it knew about out of specification moringa and finally authorized Baobab to use a kill step but instructed Baobab that no one could know about the kill step. ................................................................. 15

    E.  It would have been impossible for Rhema to detect and prevent salmonella contamination in the product through testing alone. ..................................................... 15

    F.  GOL's claim for breach of the implied warranty of merchantability stems from its specifications for untreated moringa sourced from Baobab. ........................................ 19

IV.  ARGUMENT ............................................................................................... 19

V.  CONCLUSION ............................................................................................. 23

i

TABLE OF AUTHORITIES

**Cases**

*Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co.*,
    520 N.E.2d 1321(1988) ............................................................................... 20, 21, 22, 23

*Gerber Prods. Co. v. FBI Foods*,
    U.S. Dist. LEXIS 12734 (W.D. Mich. July 18, 1994) .............................................. 21

*Mahasco Indus., Inc. v. Anderson Halverson Corp.*,
    520 P.2d 234 (1974) ........................................................................................... 20

*Momax, LLC v. Rockland Corp.*,
    Civil Action No. 3:02-CV-2613-L, 2005 U.S. Dist. LEXIS 6201, at *17
    (N.D. Tex. Apr. 11, 2005) .................................................................................. 20

*N.J. Transit Corp. v. Harsco Corp.*,
    497 F.3d 323 (3d Cir. 2007) ............................................................................... 20

*Sci. Components Corp. v. Sirenza Microdevices, Inc.*,
    No. 03-CV-1851 (NGG)(RML), 2006 U.S. Dist. LEXIS 61872 (E.D.N.Y. Aug. 30, 2006) ... 21

*Zeon Chems. USA v. CPS Chem. Co.*,
    1997 U.S. App. LEXIS 29168 (6th Cir. Oct. 22, 1997) .............................................. 21

**Statutes**

Fla. Stat. Ann. § 672.314 ..................................................................................... 19

Fla. Stat. Ann. § 672.316 ......................................................................... 2, 10, 19, 20

Fla. Stat. Ann. § 672.317 ..................................................................................... 20

**Other Authorities**

Special Project: Article Two Warranties in Commercial Transactions: An Update.
    [Part 2 of 20.] 72 Cornell L. Rev. 1159, 1285 .......................................................... 20

Rhema Health Products, Inc., through counsel and pursuant to Federal Rule of Civil Procedure 56 and DUCivR 56-1, hereby submits its Motion for Partial Summary Judgment on Plaintiff's Count II Claim for Breach of the Implied Warranty of Merchantability under Florida Code §§ 672.314-672.316, stating as follows:

## I.      INTRODUCTION AND RELIEF SOUGHT

Plaintiff, Garden of Life ("GOL"), complains that salmonella-contaminated moringa supplied by Baobab was incorporated into the finished product by Rhema and that it should be permitted to pursue an implied warranty claim.  Yet, Rhema only agreed to provide a limited warranty that the product would be manufactured as specified by GOL according to GOL's formula and specifications using GOL's chosen suppliers. And GOL contractually retained all liability for its formula and specifications. Because it was GOL's formula and specifications which mandated that untreated, wild-harvested moringa out of Africa supplied by its chosen vendor Baobab that led to the contamination, summary judgment on GOL's breach of implied warranty claim should be granted. Rhema's express manufacturing warranty that it would comply with GOL's formula and specifications displaces any implied warranty.

GOL specified moringa as the third top ingredient in its formula. GOL specified at the time the Manufacturing Agreement was entered into that the moringa come from its approved supplier, NP Nutra. NP Nutra's moringa was treated with a kill step. Thereafter, GOL mandated a change to a cheaper untreated moringa supplier, Baobab. And GOL exerted control of Baobab's process, specifying that Baobab not subject its moringa to a kill step. GOL, being fully appraised that the standard of care for moringa required a kill step and the risks it assumed by not permitting a kill step, explicitly specified, "*We don't want any type of processing. Need to keep*

*this formula 'raw.'"*[1]

The Manufacturing Agreement expressly recognized that Rhema's manufacturing warranty was just that: a limited warranty that its manufacturing would not cause adulteration of the product. "GOL acknowledges that Rhema is *only manufacturing* the product in accordance with Finished Goods Specification and Packaging Specifications provided by GOL and suppliers approved or recommended by GOL."[2] The Manufacturing Agreement cannot be discarded as suggested by GOL so that it can have a greater and conflicting warranty implied. As Florida law makes clear, "where the buyer gives detailed specifications as to the goods" the implied covenant of merchantability "will [not] normally apply to the transaction …."[3]

The Court should grant summary judgment on GOL's Count II, breach of the implied warranty of merchantability under Fla Code §§ 672.314-672.316, which fails as a matter of law because GOL gave the detailed specifications which caused the issue of which it now complains. GOL cannot call upon equity to imply a warranty to displace the limited manufacturing warranty GOL negotiated and accepted. Particularly where it was GOL's formula and specifications for untreated moringa from Baobab (that was subsequently determined to have salmonella) which have proven ill advised.

## II.      BACKGROUND

### A.  GOL hired Rhema to help it manufacture a dietary supplement.

---

[1] Ex. C, April 2015 e-mail chain among Darren Auramenko, Suzanne Cantwell, Stephen Broburg and Brendan Kesler, at RHEMA00002333 (emphasis added).

[2] Ex. A, Manufacturing Agreement, § IV.3.

[3] Fla. Stat. Ann. § 672.316, cmt. 9.

GOL "is a manufacturer and distributor of Dietary Supplements and Natural Health Products,"[4] including a product marketed to consumers under the label Raw Meal Organic Shake & Meal Replacement (the "GOL dietary supplement"). In simplest terms, the dietary supplement was a dry powder that contained a mixture of dried agricultural ingredients, such as flaxseed, chia, alfalfa grass, barley grass, oat grass, wheat grass, spinach, stevia and spirulina. GOL directed consumers to ingest the powder by mixing it with a cold liquid, such as water or almond milk, and then drinking the resulting concoction. GOL marketed the supplement as being rich in protein, fiber, probiotics, enzymes, vitamins and minerals.

For at least six years, before approaching Rhema, GOL had marketed and sold the GOL dietary supplement that was made by another company, Nature's Product. As originally formulated and sold, the GOL dietary supplement's main ingredient was rice protein. After consumers expressed concerns that rice protein contained high levels of "heavy metals," GOL decided to use pea protein instead, which created its own problem. Pea protein is not as palatable as rice protein. In fact, it tastes bad.

One of Rhema's market niches was flavoring otherwise unsavory products to make them more palatable. Because of Rhema's experience flavoring other pea protein products for other dietary supplement companies, GOL hired Rhema to help it improve the organoleptic properties (taste, sight, smell and feel) of the pea-protein formula of the GOL dietary supplement. GOL had already created the updated formula, which included moringa as the third largest ingredient, before approaching Rhema.

---

[4] Ex. B, Quality Agreement, p.1.

**B. GOL had knowledge and experience with moringa, which was an integral component of two of its products already on the market, as well as a long-established relationship with Baobab, before it came to Rhema.**

As GOL's VP of Product Development, Jeff Brams had the responsibility of going out and finding raw materials. In 2007 or 2008, Jeff Brams learned about moringa as an ingredient in dietary supplements and began discussions with Baobab about sourcing moringa from Africa for GOL products. GOL subsequently researched moringa's nutritional profile, historical use, and protein content. GOL also obtained samples of moringa leaf powder to inspect its organoleptics, such as color, aroma and taste.

In January 2013, Mr. Brams traveled to India to visit the facilities of GOL's moringa supplier, Green Chem. He observed moringa being harvested and otherwise learned how Green Chem turned the leaves into a powder.  By 2013 or 2014, moringa was already an integral component of two other GOL products already on the market.  GOL had been selling MyKind Organics multivitamin for a year or two and GOL had already launched and was selling another protein product, Organic Plant Protein Product, containing moringa. NP Nutra was already supplying the moringa used in GOL's Organic Plant Protein Product. The original formula GOL provided to Rhema at the outset specified for moringa supplied by NP Nutra. NP Nutra's moringa was treated moringa that had been subjected to a kill-step, steam treatment.

**C. Rhema's limited manufacturing warranty provided it would manufacture product according to GOL's formula and specifications: GOL retained sole responsibility for its formula and specifications and GOL retained choice of vendors.**

Under the parties' agreements, GOL retained various responsibilities vis-à-vis the manufacturing of the dietary supplement. GOL retained responsibility to provide Rhema with complete and detailed "specifications" for the GOL dietary supplement.  These specifications

included what ingredients to use and what process. GOL also retained the right to select and designate the third-party vendors who supplied the moringa.  GOL retained "full responsibility" for any health or safety hazards created or caused by its specifications.

Under the terms of the parties' agreements, Rhema was to manufacture the product according to GOL's formula and specifications using the ingredients provided by GOL's designated third-party suppliers. Rhema was allowed to perform some testing at GOL's expense on the first few shipments to screen for contaminants such as heavy metals, pesticides or microbials.  After that, GOL required Rhema to use skip-lot testing, whereby under the contract Rhema was required to skip testing on subsequent shipments.  Rhema was then to mix the ingredients together to create a finished product.

### D. GOL provided the post-agreement specification to use untreated moringa from Baobab in place of treated moringa from NP Nutra.

Before manufacture of the product began, GOL provided Rhema with a master formula, which called for the use of moringa as an ingredient. Moringa is a protein-rich plant that grows in tropical and subtropical climates like the Himalayan foothills of northwestern India where it originated. Rhema did not participate in the decision to use moringa powder in the GOL dietary supplement.

GOL originally specified that treated moringa be supplied by NP Nutra, a company out of India, with which it had a preexisting relationship. NP Nutra was already providing the moringa used in GOL's Organic Plant Proteins that was manufactured by Nature's Product. NP Nutra's Product Specification sheet expressly stated that the treatment method used on its moringa was "Steam Treated." Which means that NP Nutra subjected the moringa it supplied to a "kill-step," i.e., it treated the moringa with steam to kill microbial contaminants.

After manufacture of the GOL dietary supplement had commenced, however, GOL specified that the supplier of moringa was to change. Instead of farm-cultivated, kill-step treated moringa supplied by NP Nutra, GOL specified that Baobab was to supply cheaper wild-harvested, untreated moringa from Africa. Rhema did not participate in the decision to change to moringa from Baobab. Rather, that decision was made by GOL's VP, Jeffrey Brams, who wanted to source moringa from Baobab, in part, because it was cheaper than NP Nutra's treated product.

Though Baobab repeatedly informed GOL the moringa it was providing contained higher than acceptable total plate count levels of microorganisms, including coliforms which are known as indicator bacteria commonly found in feces, GOL specified that Baobab was not to decontaminate or treat the moringa via a kill step. GOL did so to obtain a marketing advantage in the competitive health-products industry where customers often prefer products labeled "raw," or "unprocessed" or "natural."

In short, GOL gave Rhema express specifications concerning all aspects of the production of the dietary supplement that led to the issue it now complains. GOL's formula specified for moringa. GOL specified the moringa was to be supplied by Baobab. GOL specified Baobab was not to treat the moringa and it was not to be subjected to a kill step. These specifications by GOL were the ultimate cause of the alleged salmonella contamination.

**E.  Using untreated moringa creates substantial risks of pathogenic contamination.**

GOL's decision to opt for cheaper untreated moringa from Baobab was not without substantial risk. Raw agricultural ingredients, like moringa, are particularly susceptible to salmonella contamination. This is especially the case where, as here, the moringa was wild-

harvested from the bush in a developing country where sanitation protocols are not as robust, or as stringently enforced, as those in the United States. Additionally, though Rhema conducted testing, the testing did not detect contamination and indeed cannot detect all instances of contamination. There are at least three reasons for this.

First, when a laboratory tests a product like the GOL dietary supplement, it cannot test the entire batch, as the testing destroys the product tested. If an entire batch were tested, there would be nothing left to sell. Consequently, a laboratory only tests a limited number of samples from any given batch. Bacterium like salmonella virchow typically does not spread uniformly throughout a batch, but instead exists and grows within confined "hotspots" or "pockets" within the batch. It is possible that samples taken for testing from a batch could contain no bacterium, even though the batch as a whole contains bacterium hotspots.

Second, the tests for screening for bacterium like salmonella virchow are not always accurate or correct. False negatives are common. Even if a sample includes salmonella contamination, the best tests on the market will still fail to identify a contaminated sample as, in fact, contaminated. By way of example, FDA BAM I, recognized as one of the most robust sampling schemes when used with a perfect method, will fail to identify salmonella 30% of the time in a production lot in which 2% of the sample is contaminated. There is no guarantee that a test of salmonella-contaminated moringa will come back positive.

Third, under the parties' agreements, GOL paid for testing and required Rhema to use a "skip-lot protocol." This means that Rhema had to test initial shipments from any third-party supplier from whom GOL sourced ingredients. If none of the tests from the initial shipments

came back positive for salmonella virchow or other bacterial contaminant, Rhema had a contractual obligation not to conduct microbial testing on subsequent shipments.

In short, through laboratory testing alone, Rhema could not have ensured that the GOL dietary supplement that it manufactured with GOL was free from salmonella contamination. Though there was a mechanism – a kill step – that could have been employed to eliminate the risk of contamination, GOL specified that Baobab and Rhema not to use one. At least, until November 16, 2015 when GOL finally consented to Baobab's repeated requests to employ a kill step and told Baobab it was to keep its approval of the kill step a secret.

### F. GOL eventually consented to Baobab's repeated requests to use a kill step on the moringa, but only after some of the allegedly contaminated moringa had been incorporated into finished product.

On November 9, 2015, a representative of Baobab, Stephen Broburg, sent an email to Jeffrey Brams of GOL requesting that GOL "revisit[]" its decision not to use a kill step on the moringa leaf powder. Mr. Broburg warned "the coliform levels are too high in the raw Moringa leaf powder" and suggested that "a kill step" would provide an effective remedy.[5]

Thereafter, GOL initiated and held a clandestine meeting with Baobab to discuss these microbiological issues and the steps the two of them were going to take. Neither GOL nor Baobab invited Rhema to or involved Rhema in the meeting, and Rhema did not participate therein. At the meeting, GOL told Baobab to implement a kill step, but warned Baobab that moringa leaf powder "needed to be really close in color because the rest of the staff was not to know about the kill step." Baobab complied with GOL's instruction and did not disclose to Rhema that GOL had finally authorized use of a kill step.

---

[5] Ex. I, November 9, 2015 e-mail chain, Broburg/Bruck/Brams, at Tri-Iso00000175.

8

### G. GOL only recalled product that contained untreated moringa from Baobab.

In January 2016, the FDA initiated an investigation into alleged salmonella contamination in the GOL dietary supplement. At the outset of the investigation, GOL voluntarily recalled all lots of the product manufactured between August 1, 2015 and December 31, 2015.

At first blush, these dates appeared arbitrary. GOL made no effort to establish a connection between the lots manufactured on these dates to product that tested positive for salmonella contamination during the FDA's investigation. However, upon closer examination, these dates make sense. The lots manufactured between August 1, 2015 and December 31, 2015 contained Baobab's untreated moringa that GOL had specified be untreated. Lots manufactured before those dates contained NP Nutra's treated moringa, while lots manufactured after those dates contained Baobab's treated moringa.

### H. GOL's claim for breach of the implied warranty of merchantability, Fla. Code §§ 672.314-672.316.

GOL has alleged that some lots of the untreated moringa supplied by Baobab that were incorporated into the product contained salmonella. GOL alleges it voluntarily recalled all GOL dietary supplement that contained untreated Baobab moringa. GOL has alleged that the source of the salmonella contamination was the moringa from Baobab. Finally, GOL has alleged that, because of the alleged salmonella contamination and its decision to voluntarily recall all GOL dietary supplement that contained Baobab moringa (even lots of moringa that had shown to be negative), Rhema should be held liable to GOL for breach of the implied covenant of merchantability under Florida law.

Ultimately, GOL's claims against Rhema for breach of the implied warranty fail because GOL provided the very specifications of which it now complains. It was GOL who decided to switch from kill-step treated moringa from NP Nutra to the cheaper untreated moringa from Baobab and to specify that neither Baobab nor Rhema subject the moringa to a kill step.

Moreover, the parties' agreements expressly address this question: "[i]n all cases, [GOL] is the sole owner of the product formula and has full responsibility for safety, efficacy and claims made based on the product formula and specifications." As does Florida law, "where the buyer gives detailed specifications as to the goods," the implied warranty of merchantability will not "apply to the transaction unless consistent with the specifications."[6]

As discussed more thoroughly below, Rhema only warranted its manufacturing would comply with GOL's formula and specifications and that it would not cause contamination. Rhema could not have taken measures to ensure compliance with the implied covenant of merchantability without breaching its express covenant to comply with GOL's formula and instructions that moringa was to be sourced from Baobab and that Baobab's moringa was not to be treated with a kill step. It was impossible for Rhema to comply with both GOL's specifications and not breach the contract.

The only way for Rhema to ensure it was providing a merchantable, contamination-free product was to deploy a kill step. But GOL expressly prohibited Rhema from so doing and GOL bore full responsibility for the safety of its product formula and specifications. Because of this inconsistency, the express provisions of the parties' agreements displace any implied warranty of merchantability.

---

[6] Fla. Stat. Ann. § 672.316, cmt. 9.

### III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

**A. The express manufacturing warranty required Rhema to comply with GOL's specifications and made GOL responsible for safety hazards arising from its formula and specifications.**

1.      In its complaint, GOL asserts that the parties entered into the "Rhema Manufacturing Agreement," dated January 22, 2015 (the "Manufacturing Agreement")[7]; and the "Atrium Innovations, Inc., Garden of Life, LLC Quality Agreement," dated January 22, 2015 (the "Quality Agreement").[8]

2.      The Manufacturing Agreement, under Section IV. Warranties Conformity, provides,

> **IV. Warranties Conformity**
> 1. The Products furnished to GOL under this Agreement shall fully conform to their Finished Goods Specifications and be pure and free from adulteration, and Rhema does hereby guarantee to GOL that the method of manufacturing of the Products shall comply with 21 CFR part 111, which was published by the FDA in June 2007."[9]

3.      The Manufacturing Agreement, under Section IV. Warranties Conformity, further provides,

> GOL acknowledges that Rhema is only manufacturing the Product in accordance with Finished Goods Specifications and Packaging Specifications provided by GOL and suppliers approved or recommended by GOL.[10]

---

[7] Ex. A, Manufacturing Agreement.

[8] Ex. B, Quality Agreement, p.1.

[9] Ex. A, Manufacturing Agreement, § IV.1.

[10] *Id.* at § IV.3.

4.      The Manufacturing Agreement provides: "Rhema shall be responsible for securing and purchasing all raw materials from GOL designated and approved suppliers and vendors."[11]

5.      The Manufacturing Agreement provides,

GOL may, from time to time, during the Term of this Agreement change the Finished Goods Specifications and Packaging Specifications of the Products after giving prior written notice to Rhema, and both parties agree in writing to such changes.[12]

6.      The Quality Agreement states: "[Rhema] shall manufacture, fill, package, test, and store the bulk, WIP, and finished Product in accordance with approved specifications and cGMPs."[13]

7.      As set forth in the Quality Agreement,

**In all cases, GOL is the sole owner of the product formula and has full responsibility for safety, efficacy and claims made based on the product formula and specifications.[14]**

8.      Though Rhema warranted that its manufacturing of the product would be "pure and free from adulteration,"[15] that manufacturing warranty was expressly limited.  GOL – not Rhema – would be responsible for impurities or adulterations caused by or arising from GOL's specifications or GOL's decision to use a particular third-party supplier: "GOL acknowledges that [Rhema] is only manufacturing the Product in accordance with Finished Goods

---

[11] *Id.* at § II.4.

[12] *Id.* at § II.5.

[13] Ex. B, Quality Agreement, § 3.1.

[14] *Id.* at § 6.1 (emphasis added).

[15] Ex. A, Manufacturing Agreement, § IV.1.

Specifications and Packaging Specifications provided by GOL and suppliers approved or recommended by GOL."[16]

9.      The Manufacturing Agreement provides that GOL has right to "change[]" any "Formula, Process, Specification or Packaging Specification."[17]

**B.  GOL specified that the moringa should not be subjected to a "kill step."**

10.      GOL's original formula specified that Rhema was to use moringa powder as an ingredient in the Product.[18]

11.      Originally, GOL specified that NP Nutra was its approved supplier of moringa.[19] NP Nutra's moringa was treated with a "kill step" by steam-treating it.[20]

12.      GOL subsequently specified that it was changing approved suppliers of moringa to company called Baobab.[21]

13.      Baobab reportedly ran tests on its initial batches of moringa. These tests indicated

---

[16] *Id.* at § IV.3; *see also* Ex. B, Quality Agreement, § 9.1 ("Only raw ingredients/packaging components from GOL approved suppliers will be used in the manufacturing of GOL products unless GOL identifies required vendors not on the list or has independently procured raw ingredients/packaging components").

[17] *Id.* at § I.8.

[18] Ex. D, 2/25/15 Master Formulas.

[19] *Id.*; *see also* Ex. E at RHEMA00005804 (email exchange between Jessica Giancola and Frank Wong, dated July 23, 2014 at 4:12 p.m., in which they discuss obtaining samples of moringa from "NP Nutra").

[20] Ex. F, Product Specification – Moringa Leaf Powder Organic, RHEMA00005619.

[21] Ex. G at RHEMA0005813. Email exchange from Darren Auramenko (an affiliate of Rhema) to Lone Jorgenson (also an affiliate of Rhema), dated March 2, 2015 at 4:47 p.m., in which Mr. Auramenko states that he "learned today," i.e., March 2, 2015, that NP Nutra was not going to be "the long-term supplier for Moringa."

that its moringa had high concentrations of bacteria.[22]

14.     Baobab informed GOL of these test results and asked for approval to the use of a dry steam "kill step[]" in the manufacturing process.[23]

15.     In a subsequent email from Darren Auramenko to Suzanne Cantwell, Mr. Auramenko asks, "Just to be certain, GOL does not favor the 'dry steam process, correct?"[24] To which Ms. Cantwell replied, "You are correct." Ms. Cantwell further stated,

*"We don't want any type of processing.* Need to keep this formula 'raw.'"[25]

16.     GOL wanted to market its Product as "raw."[26]

17.     GOL specified that no kill step was to be used even though Baobab had informed it that "most moringa leaf powder processors around the world irradiate moringa or use UV or dry steam kill steps."[27]

**C. GOL subsequently continued to exercise control over the moringa specifications and processes.**

---

[22] Ex. C at RHEMA00002334. Email from Stephan Broburg (of Baobab) to Darren Auramenko (an affiliate of Rhema) and cc'd to Suzanne Cantwell (of GOL), and Brendan Kesler, dated April 16, 2015 at 5:05 p.m.

[23] *Id.*

[24] *Id.* at RHEMA00002333. Email from Darren Auramenko to Suzanne Cantwell (of GOL), dated April 16, 2015 at 5:45 p.m.

[25] *Id.* at RHEMA00002333 (emphasis added). Email from Suzanne Cantwell (of GOL) to Darren Auramenko and cc'd to Brendan Kesler, dated April 17, 2015 at 4:21 a.m.

[26] *Id.*

[27] *Id.* at RHEMA00002334. Email from Stephan Broburg to Darren Auramenko and cc'd to Suzanne Cantwell and Brendan Kesler, dated April 16, 2015 at 5:05 p.m.

18.     In June 2015, GOL approved the use of a "heat treatment" on a single batch of moringa leaf powder, but only on the express condition that the use of the heat treatment would be "a one time deviation" and that subsequent batches would not receive heat treatment.[28]

**D. Months before the recall, GOL concealed information it knew about out of specification moringa and finally authorized Baobab to use a kill step but instructed Baobab that no one could know about the kill step.**

19.     In an email dated November 9, 2015 at 2:33 p.m., a representative of Baobab, Stephen Broburg, informed Jeffrey Brams that "the coliform levels are too high in the raw Moringa leaf powder" and suggested that "a kill step" would provide an effective remedy.[29]

20.     Subsequently, on November 16, 2015, Michael Lee, GOL's then Senior Director of Product Development, had a telephone call with representatives from Baobab in which he instructed Baobab to deploy a kill step on the moringa leaf powder.[30]

21.     Rhema was not invited to and did not participate in the conversation.[31]

22.     Additionally, Mr. Lee instructed Baobab that others were not to know about the kill step.[32]

**E. It would have been impossible for Rhema to detect and prevent salmonella contamination in the product through testing alone.**

---

[28] Ex. H. Email from Silvia Herrera (of GOL) to Spencer Porter (of Rhema), dated June 4, 2015 at 9:53 a.m.; email from Jeffrey Brams (of GOL) to Josue Molina and Silvia Herrera dated June 5, 2015 at 11:29 a.m.; and email from Spencer Porter to Silvia Herrera dated June 5, 2015 at 2:00 p.m.

[29] Ex. I at Tri-Iso00000175.

[30] Ex. J, Brams. Dep., pp. 101:18-102:23, 114:16-120:1; *see also* Ex. K at Tri-Iso00000270-Tri-Iso00000271. Email from Stephen Broburg (of Baobab) to David Bruck (of Baobab), dated March 29, 2016 at 4:59 p.m. and email from Michael Lee to Stephan Broburg, dated November 16, 2015 at 10:02 a.m.

[31] *Id*.

[32] *Id*.

23.     As set forth in the Quality Agreement under Finished Goods Testing and Release

of Product,

> The following is a description of the GOL standard testing plan for finished product. GOL has established a process based on FDA guidelines and industry standard practices. If additional testing is requested, GOL will modify its standard testing plan accordingly and include the modifications on the product's finished good specification. All additional testing costs will be at the expense of GOL.[33]

24.     As set forth in the Quality Agreement under Testing Schedule/Frequency of

incoming raw ingredients:

> 9.3.8. <u>Testing Schedule/Frequency of incoming raw ingredients</u>- To qualify the supplier's COA, at a minimum the first three receipts of all new ingredients must be tested. *Skip-lot protocol testing should apply to all subsequent lots received*. Frequency should be indicated in ingredient specification. Full testing must be done at least once per year.[34]

25.     As set forth in the Quality Agreement under Microbial Testing:

> 9.3.10. <u>Microbial Testing</u>
> …
> 9.3.10.1. To qualify the supplier's COA, at a minimum the first three receipts of all new ingredients must be tested. *Skip-lot protocol testing should apply to all subsequent lots received*. Frequency should be indicated in ingredient specification.[35]

26.     As set forth in the Quality Agreement, under Sampling Procedure:

> **11.Sampling Procedure**
> 11.1 Rhema statistically samples all incoming raw ingredient intended for manufacturing according to the square root of n + 1 sampling convention. The raw ingredient samples are then sent to the in-house laboratories (or third party laboratories) for testing as required."[36]

27.     During the manufacture of dry agricultural products, laboratory testing alone

---

[33] Ex. B, Quality Agreement, § 14.1.

[34] *Id.*, § 9.3.8 (emphasis added); *see also* §§ 9.2.1, 9.3.1 and 9.3.10.1.

[35] *Id.*, § 9.3.10.1 (emphasis added).

[36] *Id.*, § 11.1.

cannot detect or screen out all instances of salmonella contamination.[37]

28.     Laboratory testing for salmonella contamination involves taking samples from a larger batch of product and then conducting a battery of tests on the samples to see if they contain salmonella.[38]

29.     Testing protocols and procedures spoil the testing sample, meaning that once a sample has been tested it is no longer fit for human consumption.[39]

30.     By its nature, salmonella contamination will not spread evenly throughout a batch of powdered product; instead, salmonella contamination exists and grows within confined "pockets" or "hotspots" within the batch.[40]

31.     There is always the possibility that samples taken from a salmonella-contaminated batch for testing purposes will not, themselves, contain salmonella.[41]

32.     A batch of product could have all samples test "negative" of salmonella but, nonetheless, still contain pockets or hotspots of contamination.[42]

33.     The only way to ensure that a batch does not have a pocket of salmonella contamination would be to test the entire batch.[43]

34.     Because testing protocols spoil the product tested, testing the entire batch would

---

[37] Ex. L, Kornacki Decl., ¶ 5.

[38] *Id.*, ¶ 5.a.

[39] *Id.*, ¶ 5.b.

[40] *Id.*, ¶ 5.c.

[41] *Id.*, ¶ 5.d.

[42] *Id.*, ¶ 5.e.

[43] *Id.*, ¶ 5.f.

leave nothing left to sell to consumers.[44]

35.     Moreover, even if a sample contains salmonella contamination, there is no guarantee that subsequent testing will identify the contamination.[45]

36.     Even when properly conducted, the best tests on the market and highest level of recognized sampling schemes often fail to identify a contaminated lot as, in fact, contaminated. By way of example, FDA BAM 1, recognized as one of the most robust sampling schemes, will fail to identify salmonella virchow 30 percent of the time in a production lot in which 2 percent of the lot is contaminated.[46]

37.     Based on the foregoing, through salmonella testing alone, it would have been impossible for Rhema to identify and screen out all instances of salmonella contamination in the products that it helped GOL manufacture.[47]

38.     A simple, cost-effective way to overcome the limitations of salmonella testing is to run ingredients used in ingestible products through a "kill step," i.e., exposing the product to radiation, heat or other bactericidal processes to kill bacterial contamination. If properly conducted, a kill step will eliminate salmonella contamination in a product.[48]

39.     If the dietary supplement that Rhema made with GOL was, in fact, contaminated with salmonella from Baobab's moringa leaf powder, GOL could have prevented the

---

[44] *Id.*, ¶ 5.g.

[45] *Id.*, ¶ 5.h.

[46] *Id.*, ¶ 5.i.

[47] *Id.*, ¶ 7.

[48] *Id.*, ¶ 8.

contamination by allowing Rhema or Baobab to perform a kill step on the moringa.[49]

**F.   GOL's claim for breach of the implied warranty of merchantability stems from its specifications for untreated moringa sourced from Baobab.**

40.    GOL alleges that Rhema failed to meet its contractual obligations by supplying products "with Organic Moringa Leaf powder contaminated by *Salmonella Virchow*."[50]

41.    GOL further alleges that "[t]he Organic Moringa leaf powder … was determined to be the source of the contamination."[51]

## IV.    ARGUMENT

Rhema's express limited manufacturing warranty to comply with GOL's specifications displaced the implied warranty of merchantability. Summary judgment dismissing GOL's Count II claim of implied warranty of merchantability under Florida Code §§ 672.314-672.316 should be granted.

Under Florida law, the implied covenant of merchantability is a creature of statute. "Unless excluded or modified … a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[52] "Goods to be merchantable must be at least such as … [a]re fit for the ordinary purposes for which such goods are used."[53] "The situation in which the buyer gives precise and complete specifications to the seller" is "a frequent circumstance by which the implied warranties may be excluded."[54] In

---

[49] *Id.*, ¶ 11.

[50] Compl., Dkt. 2, filed December 2, 2016, ¶ 15.

[51] *Id.*, ¶ 18.

[52] Fla. Stat. Ann. § 672.314(1).

[53] *Id.*, § 672.314(2).

[54] *Id.*, § 672.316, cmt. 9.

such a transaction, the implied warranty of merchantability "must be considered in connection with [Florida Code § 672.317(3)],"[55] which provides "[e]xpress warranties displace inconsistent implied warranties."[56]

"[W]here the buyer gives detailed specifications as to the goods," the implied warranty of merchantability will not "apply to the transaction unless consistent with the specifications."[57] This rule is well-founded, as a contrary rule "would place the seller in a hopeless dilemma."[58] "If compliance with the buyer's specifications exposed the seller to the risk of delivering unmerchantable goods … then the seller would have to breach one warranty in order to honor the other."[59]

Several courts have held that where a buyer gives precise and complete specifications to a manufacturer the specifications displace the implied warranty of merchantability as a matter of law.[60] In *Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co.*,[61] a contractor installed a

---

[55] *Id.*, § 672.316, cmt. 9.

[56] *Id.*, § 672.317(3).

[57] *Id.*, § 672.316, cmt. 9.

[58] Special Project: Article Two Warranties in Commercial Transactions: An Update. [Part 2 of 20.] 72 Cornell L. Rev. 1159, 1285.

[59] *Id.* at 1285.

[60] *See Momax, LLC v. Rockland Corp.*, Civil Action No. 3:02-CV-2613-L, 2005 U.S. Dist. LEXIS 6201, at *17 (N.D. Tex. Apr. 11, 2005) ("a reasonable jury could return a verdict in favor of [a seller] on [a buyer's] implied warranty of merchantability claim … since where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications") (citation and internal quotation marks omitted); *N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 328-31 (3d Cir. 2007) (holding that a buyer's specifications in a buyer-drafted contract displaced the implied warranty of merchantability); *Mahasco Indus., Inc. v. Anderson Halverson Corp.*, 520 P.2d 234 (1974) (holding that "the implied warranty of merchantability is limited by an express warranty of conformity to a precise description supplied by the buyer, and if the latter warranty is not breached, neither is the former").

brick floor in a dairy plant. Before installation, the buyer provided the contractor with detailed plans, which dictated the floor's thickness, the kind and size of the floor's bricks, the type of grouting, and the location of expansion joints around the perimeter of the floor. The plans did not call for expansion joints at the "high points" in the floor, and, during the construction process, the buyer's representatives instructed the contractor not to install expansion joints at the high points in the floor. Subsequently, some of the floor's bricks buckled upwards or came loose at the high points in the floor, and the buyer sued for breach of the implied covenant of merchantability.

On appeal, the *Cumberland* court affirmed the trial court's judgment in favor of the contractor. Noting that "[w]hen goods are provided according to plans and specifications

---

Even cases that ultimately held that detailed specifications did not displace the implied warranty of merchantability support the conclusion that, under the facts is this case, GOL's claim for breach of the implied warranty of merchantability fails as a matter of law. In *Gerber Prods. Co. v. FBI Foods*, for instance, a buyer hired a supplier to package juice concentrate using materials and techniques – a specialized carton, hermetic sealing, and cold-fill pasteurization – that purportedly made the juice shelf-stable. U.S. Dist. LEXIS 12734 (W.D. Mich. July 18, 1994). The buyer later learned that, over time, the packaging failed, causing the juice concentrate to become discolored and lose its vitamin C content. The buyer sued the supplier for breach of the implied covenant of merchantability. The court held that the buyer's specifications did not displace the implied warranty of merchantability because the specifications concerned the juice's formula, not the carton or the sealing/pasteurization process, meaning there was no causal nexus between the specifications and the alleged breach. *Id.* at *27-32. Here, by contrast, there is a causal nexus between GOL's specifications and the alleged salmonella contamination. GOL's decision not to run the moringa through a kill step substantially increased the risk of salmonella contamination.

Moreover, unlike the defendants in *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851 (NGG)(RML), 2006 U.S. Dist. LEXIS 61872 (E.D.N.Y. Aug. 30, 2006) or *Zeon Chems. USA v. CPS Chem. Co.*, 1997 U.S. App. LEXIS 29168 (6th Cir. Oct. 22, 1997), who could have complied with the buyer-imposed specifications and still provided a merchantable product, Rhema could not have taken steps necessary to avoid contamination without straying from GOL's specifications. The only way to ensure that the moringa was free from pathogens like salmonella was to treat it via a kill step.

[61] 520 N.E.2d 1321, 1325 (1988).

furnished by the buyer … no implied warranty of merchantability arises," the court held that the contractor's express warranty to install the floor according to the buyer's specifications – without expansion joints at the high places in the floor – displaced the implied warranty of merchantability.[62] The flooring contractor could not comply with the buyer's decision not to use expansion joints without exposing itself to the risk of delivering a brick flooring that, over time, would buckle or come loose. *Cumberland* stands for the commonsense proposition that a buyer cannot rely on the implied covenant of merchantability if it limits, through specifications, a supplier's "discretion" in how to best make goods.

Like the buyer in *Cumberland*, who gave the contractor detailed specifications concerning the brick floor, GOL provided Rhema with detailed specifications concerning the Product. Like the buyer in *Cumberland*, who insisted on the nonuse of expansion joints at the floor's high points despite the contractor's express recommendation for the use of such joints, GOL insisted on the nonuse of a "kill step" despite an express recommendation for a "kill step."

While true that GOL's specifications did not call for salmonella contamination, by the same token, the *Cumberland* buyer's specifications did not call for loose or buckling bricks. In each case, however, the buyer's specifications exposed the seller to the risk of delivering unmerchantable goods. The *Cumberland* buyer's decision not to use expansion joints in the floor's high points increased the risk of buckling bricks and ultimately caused the bricks to come loose. GOL's decision not deploy a kill step increased the risk of pathogenic contamination and

---

[62] *Cumberland*, 520 N.E.2d at 1324-1325. In reaching its decision, the *Cumberland* court assumed, without deciding, that the contract was for the provision of goods and, therefore, fell within the ambit of the Uniform Commercial Code. *Id*. at 1324-1325.

ultimately resulted in a salmonella outbreak. Under these circumstances, the *Cumberland* court held that buyer's claim failed as a matter of law because the express warranty to comply with specifications was incompatible with and displaced the implied warranty of merchantability.

This Court should do the same. By specifying that the moringa remain untreated, GOL put Rhema in an impossible position. If Rhema treated the moringa with a kill step, it would breach its express covenant to comply with GOL's specifications. If it did not treat the moringa with a kill step, it risked delivering unmerchantable goods. Accordingly, Rhema's express warranty to manufacture the product according to GOL's formula and specifications displaced the implied warranty of merchantability as a matter of law, and the Court should grant Rhema's motion for partial summary judgment asserting a warranty of merchantability can be implied.

## V.     CONCLUSION

Rhema respectfully requests that the Court grant Rhema's Motion for Partial Summary Judgment and dismiss GOL's Count II claim for Breach of the Implied Warranty of Merchantability Fla Code §§ 672.314-672.316 as it fails as a matter of law.

DATED this 12th day of February, 2018

CHRISTENSEN & JENSEN, P.C.

*/s/ Heather L. Thuet*
Heather L. Thuet
Bryson R. Brown
*Attorneys for Defendant and Third-Party*
*Plaintiff Rhema Health Products Inc.*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of February, 2018, the foregoing **RHEMA HEALTH PRODUCTS, INC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COUNT II CLAIM FOR BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY, FLA CODE §§ 672.314-672.316** was filed electronically utilizing the CM/ECF system which sent notification of such filing to the following:

Alan C. Bradshaw
abradshaw@mc2b.com
Christopher M. Glauser
cglauser@mc2b.com
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, UT 84111

Jeffrey A. Simes
jsimes@goodwinlaw.com
Joanne M. Gray
jgray@goodwinlaw.com
Michael K. Murray
mmurray@goodwinlaw.com
Amanda H. Russo
arusso@goodwinlaw.com
GOODWIN PROCTER LLP
*Attorneys for Plaintiff Garden of Life, LLC*

Ryan P. Atkinson
ratkinson@strongandhanni.com
STRONG & HANNI, P.C.
*Attorneys for Tri-Iso Tryline, LLC dba Baobab Foods*

*/s/ Heather L. Thuet* _____
*Attorney for Rhema Health Products Inc.*