Heather L. Thuet, #10106
Bryson R. Brown, #14146
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile: (866) 562-7506
Heather.Thuet@chrisjen.com
Bryson.Brown@chrisjen.com
*Attorneys for Defendant Rhema Health Products Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARDEN OF LIFE, LLC, | |
| Plaintiff, | |
| v. | |
| RHEMA HEALTH PRODUCTS INC., | **THIRD AMENDED ANSWER & COUNTERCLAIM** |
| Defendant. | |
| RHEMA HEALTH PRODUCTS INC., | Case No. 2:16-cv-01222-BSJ |
| Third-Party Plaintiff, | Judge Bruce S. Jenkins |
| v. | |
| TRI-ISO TRYLINE, LLC dba BAOBAB FOODS, | |
| Third-Party Defendant. | |

Defendant Rhema Health Products Inc. (hereinafter "Rhema"), by and through its counsel

of record, Heather L. Thuet of the law firm of Christensen & Jensen, P.C., hereby responds to the

allegations of Plaintiff's Complaint as follows:

**FIRST DEFENSE**

Plaintiff's Complaint, or a portion thereof, fails to state a claim against Rhema upon which relief may be granted.

**SECOND DEFENSE**

In responding to the allegations of the Complaint, Rhema admits, denies, or after conducting reasonable investigation, denies for lack of knowledge, and alleges with respect to the individual numbered paragraphs of Plaintiff's Complaint as follows:

**<u>INTRODUCTION</u>**

1.      Admits that Plaintiff brought an action against Rhema. To the extent facts are alleged in paragraph 1, Rhema denies the same.

2.      Admits that the referenced document speaks for itself, and denies remaining allegations in paragraph 2.

3.      Denies the allegations of paragraph 3.

4.      Admits that the Complaint speaks for itself.  To the extent facts are alleged in paragraph 4, Rhema denies the same.

**<u>PARTIES</u>**

5.      Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 5 of Plaintiff's Complaint, and therefore denies the same.

6.      Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 6 of Plaintiff's Complaint, and therefore denies the same.

7.      Admits Rhema is a company incorporated under the laws of the State of Washington and denies remaining allegations.

8.      Denies the allegations of paragraph 8.

## JURISDICTION, VENUE, AND GOVERNING LAW

9.      Paragraph 9 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema denies.

10.     Paragraph 10 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema denies.

11.     Admits that the referenced document speaks for itself but denies Plaintiff's interpretation of same and denies remaining allegations in paragraph 11.

12.     Paragraph 12 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema denies.

## FACTS

13.     Admits that the referenced document speaks for itself and denies remaining allegations in paragraph 13.

14.     Admits that the referenced document speaks for itself, and denies remaining allegations in paragraph 14.

15.     Denies the allegations of paragraph 15.

16.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 16 of Plaintiff's Complaint, and therefore denies the same.

17.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 17 of Plaintiff's Complaint, and therefore denies the same.

18.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 18 of Plaintiff's Complaint, and therefore denies the same.

19.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 19 of Plaintiff's Complaint, and therefore denies the same.

20.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 20 of Plaintiff's Complaint, and therefore denies the same.

21.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 21 of Plaintiff's Complaint, and therefore denies the same.

22.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 22 of Plaintiff's Complaint, and therefore denies the same.

23.     Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 23 of Plaintiff's Complaint, and therefore denies the same.

24.     Denies the allegations of paragraph 24.

25.     Denies the allegations of paragraph 25.

26.     Denies the allegations of paragraph 26.

## <u>COUNT I:</u>
### Breach of Contract

27.     Answering paragraph 27, Rhema realleges and incorporates by reference its responses to all the other paragraphs in the Complaint.

28.     Paragraph 28 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema admits that the referenced document speaks for itself and denies remaining allegations in paragraph 28.

29.     Denies the allegations of paragraph 29.

30.     Denies the allegations of paragraph 30.

31.     Denies the allegations of paragraph 31.

## COUNT II:
## Breach of Implied Warranty of Merchantability, Fla. Code §§ 672.314-672.316

32. Answering paragraph 32, Rhema realleges and incorporates by reference its responses to all the other paragraphs in the Complaint.

33. Paragraph 33 sets forth legal conclusions requiring neither an admission nor a denial. To the extent it may be construed to allege facts, Rhema admits that the referenced document speaks for itself and denies remaining allegations in paragraph 33.

34. Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 34 of Plaintiff's Complaint, and therefore denies the same.

35. Paragraph 35 sets forth legal conclusions requiring neither an admission nor a denial. To the extent it may be construed to allege facts, Rhema denies.

36. Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 36 of Plaintiff's Complaint, and therefore denies the same.

37. Denies the allegations of paragraph 37.

38. Rhema is without information or knowledge sufficient to form a belief as to the allegations of paragraph 38 of Plaintiff's Complaint, and therefore denies the same.

39. Denies the allegations of paragraph 39.

## COUNT III:
## Breach of Implied Covenant of Good Faith and Fair Dealing

40. Answering paragraph 40, Rhema realleges and incorporates by reference its responses to all the other paragraphs in the Complaint.

41.     Paragraph 41 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema admits that the referenced document speaks for itself and denies remaining allegations in paragraph 41.

42.     Paragraph 42 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema denies.

43.     Paragraph 43 sets forth legal conclusions requiring neither an admission nor a denial.  To the extent it may be construed to allege facts, Rhema denies.

44.     Denies the allegations of paragraph 44.

45.     Denies the allegations of paragraph 45.

## THIRD DEFENSE

Rhema denies each and every allegation of Plaintiff's Complaint not explicitly admitted herein.

## FOURTH DEFENSE

Plaintiff's damages, if any, were proximately caused by the negligence or legal fault of third parties over whom Rhema has neither control nor right to control.

## FIFTH DEFENSE

To the extent that the fault of Plaintiff and/or third parties equals or exceeds that, if any, of Rhema, Plaintiff's damages, if any, or, in the alternative, its damages are subject to reduction and/or apportionment.

## SIXTH DEFENSE

To the extent that Plaintiff failed to mitigate its damages, if any, and avoid the consequences thereof, its claims may be barred or subject to reduction and/or apportionment.

## SEVENTH DEFENSE

Plaintiff may have failed to join necessary and indispensable parties in whose absence complete and fair relief cannot be accorded.

## EIGHTH DEFENSE

To the extent that the product was designed, manufactured and tested in accordance with all applicable government standards and regulations governing the production of such products in existence at the time of its design and manufacture, and/or that the product was in compliance with and met the state of the art in the design and manufacture of similar products, Rhema is not liable.

## NINTH DEFENSE

Rhema alleges that, after appropriate discovery, the following affirmative defenses may be applicable: accord and satisfaction, estoppel, waiver, release, justification, and/or excuse. The extent to which Plaintiff's claims may be barred by one or more of the preceding affirmative defenses cannot be determined until Rhema has had an opportunity to complete discovery.

## TENTH DEFENSE

To the extent that there has been spoliation of evidence, the plaintiff's claims may be barred or limited.

## ELEVENTH DEFENSE

Fault should be allocated to all responsible parties who are not currently named, or in the future are named as parties to this lawsuit and to any other unnamed third parties who are in the supply chain and/or distribution of any products at issue in this lawsuit, including any suppliers of said product. The grounds for this notice are the allegations set forth in the Plaintiff's

Complaint. Rhema may also seek to apportion fault to any persons or entities who modified the product at issue. Rhema reserves the right to identify additional persons or entities which may be at fault as the case develops.

## TWELFTH DEFENSE

Plaintiff's claims may be barred for failure of consideration or from lack of consideration.

## THIRTEENTH DEFENSE

Plaintiff's claims may be barred and this Defendant relieved of any liability as Plaintiff materially breached the Agreement with Defendant by, among other things, failing to perform its contractual obligations.

## FOURTEENTH DEFENSE

Defendant acted in good faith and substantially performed under the Agreement.

## FIFTEENTH DEFENSE

Plaintiff's claims may be barred or limited to the extent Plaintiff failed to comply with all of the terms and conditions of the Agreement.

## SIXTEENTH DEFENSE

Plaintiff's claims may be barred or limited to the extent that Plaintiff has failed to act in good faith and/or has breached the covenant and duty of good faith and fair dealing.

## SEVENTEENTH DEFENSE

Plaintiff's claims may be barred by the economic loss rule.

## EIGHTEENTH DEFENSE

Plaintiff's claims may be barred by lack of privity.

## NINETEENTH DEFENSE

Plaintiff's claims may be barred by its lack of reliance.

## TWENTIETH DEFENSE

The implied warranty of merchantability may be displaced by the express warranty that the goods will comply with the specifications or by the parties' course of dealing or course of performance. Fla. Stat. Ann. §§ 672.316 and 672.317.

## TWENTY-FIRST DEFENSE

To the extent Plaintiff has suffered any damages, such damages should be set off in an amount to be proven.

## TWENTY-SECOND DEFENSE

Plaintiff's claims may be barred in whole or in part by or under the doctrines of unconscionability, modification, waiver, equitable estoppel and/or unclean hands.

## TWENTY-THIRD DEFENSE

Plaintiff's claims may be barred in whole or in part because the parties did not agree upon essential terms of the contract.

## TWENTY-FOURTH DEFENSE

Plaintiff's claims may be barred in whole or in part by or under the doctrines of impossibility, impracticability and/or frustration of purpose.

## TWENTY-FIFTH DEFENSE

Plaintiff's claims may be barred in whole or in part by the occurrence or failure of a condition precedent, including but not limited to Plaintiff's failure to perform its contractual obligations.

## TWENTY-SIXTH DEFENSE

Plaintiff's claims may be barred in whole or in part by knowing acceptance of risk by GOL of product containing raw high-risk ingredient.

## TWENTY-SEVENTH DEFENSE

Plaintiff's claims for alleged breach of warranty may be barred in whole or in part by the failure to give reasonable and timely notice of alleged breach.

## TWENTY-EIGHTH DEFENSE

This defendant reserves the right to allege additional defenses and/or withdraw alleged defenses based on additional discovery and investigation.

**WHEREFORE,** having answered the Complaint, Rhema prays that Plaintiff takes nothing by way of the Complaint, that the same be dismissed with prejudice, and that Rhema recover relief as appears just and equitable.

## RELIANCE ON JURY DEMAND

Rhema hereby requests a trial by jury and relies upon the jury demand made by Plaintiff.

## COUNTERCLAIM

1.      Rhema is a Washington Corporation with its principal place of business in Ogden, Utah.

2.      Rhema Health Products Inc. (hereinafter "Rhema") counterclaims against Garden of Life, LLC (hereinafter "GOL") as follows:

3.      GOL is a limited liability company incorporated under the laws of Delaware, with its principal place of business in Palm Beach Gardens, Florida, and doing business in the State of

Utah. GOL's sole member is Atrium Biotech Investments, Inc., which is organized under the laws of Delaware, with a domicile in Florida or Delaware.

4.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendant and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.     On January 22, 2015, Rhema entered into a Manufacturing Agreement "(Agreement") with GOL to manufacture GOL's Raw Organic Meal Shake & Meal product ("Raw Meal").

6.     The Agreement provides "GOL acknowledges that RHEMA is only manufacturing the Product in accordance with the Finished Goods Specifications and Packaging Specifications provided by GOL and suppliers approved or recommended by GOL."

7.     The Agreement provides RHEMA was required to secure and purchase all raw materials from GOL designated and approved suppliers and vendors.

8.     GOL specifications required the use of raw moringa oleifera aka moringa leaf powder ("Moringa Powder").

9.     GOL was the sole designer of the specifications.

10.     GOL alone was responsible for the decision to include raw Moringa Powder as an ingredient in the Raw Meal.

11.     As set forth in section 6.1 of the Quality Agreement, "In all cases, GOL is the sole owner of the product formula and has full responsibility for safety, efficacy and claims made based on the product formula and specifications."

12.     As set forth in section 6.1 of the Quality Agreement, "GOL is responsible for evaluating their formula and submitting any notification of New Dietary Ingredient (NDI) required to FDA."

13.     As set forth in section 6.1 of the Quality Agreement, "Prior to any commercial manufacturing, GOL will provide Rhema a final bill or material which lists formula ingredients and amounts along with final package configuration."

14.     As set forth in section 9.1 of the Quality Agreement, "Rhema will procure raw ingredients/packaging components for the purpose of manufacturing product unless otherwise specified in writing by GOL."

15.     As set forth in section 9.1 of the Quality Agreement, "Only raw ingredients/packaging components from GOL approved suppliers will be used in the manufacturing of GOL products unless GOL identifies required vendors not on the list or has independently procured raw ingredients/packaging components."

16.     As set forth in section 9.1 of the Quality Agreement, "Rhema will require a supplier Certificate of Analysis to accompany each lot of raw ingredient received and reviews the test results on the certificate with the specifications established for each ingredient prior to acceptance.

17.     The test results on the Certificate of Analysis that accompanied each lot of raw moringa powder supplied by Baobab satisfied GOL's specifications.

18.     As set forth in section 9.3.10 of the Quality Agreement, "9.3.10 Microbial Testing – Basic GOL microbial testing consists of Total Plate Count (aerobic), Yeast & Mold Count, LAB (lactic acid bacteria) when applicable and testing for Pathogens (Salmonella and E. coli).

Specifications and testing parameters will be established based on individual raw ingredient risk review."

19.     As set forth in section 14.1 of the Quality Agreement, "If additional testing is requested, GOL will modify its standard testing plan accordingly and include the modifications on the product's finished good specification.  Additional testing costs will be at the expense of GOL."

20.     As set forth in section 22 of the Quality Agreement, the GMP Agreement Checklist is attached as Exhibit A and incorporated by reference into the Agreement.

21.     The GMP Agreement Checklist attached as Exhibit A to the Quality Agreement sets out the responsibility for each activity and indicates the responsibility being assessed to GOL or to Rhema.

22.     The GMP Agreement Checklist provides that "GOL has full responsibility for product formulation and specifications for Bulk and Finished Goods."

23.     As set forth in section 11 of the Quality Agreement, "Rhema statistically samples all incoming raw ingredients intended for manufacturing according to the square root of n + 1 sampling convention."

24.     Rhema sampled all incoming raw moringa powder supplied by Baobab according to the square root of n + 1 sampling convention as specified by GOL.

25.     Basic GOL microbial testing, including testing for pathogens (salmonella and E. coli), was conducted on all incoming raw supplied by Baobab.

26.     Rhema complied with the Current Good Manufacturing Practice contained in C.F.R. 21 Part 111.

27.     Moringa Powder is an unusual and uncommon ingredient in health food products.

28.     Section 204(d)(2) of the Food Safety Modernization Act requires the Food and Drug Administration ("FDA") to designate foods that it considers "high risk."

29.     Under draft guidelines currently under review by the FDA, factors that the FDA may consider when determining whether a food product warrants a high-risk designation include (1) the likelihood that a particular food has a high potential risk for contamination or would support the growth of pathogenic microorganisms due to the nature of the food or the processes used to produce the food and (2) the likelihood of contamination and steps taken during the manufacturing process to reduce the possibility of contamination.

30.     After conducting a recall of Moringa-Powder-containing dietary supplement that Rhema had manufactured for GOL, Rhema was informed that raw Moringa Powder is a "high risk" ingredient due to its high potential for being contaminated with microorganisms and the absence of steps taken to reduce that likely contamination during the manufacturing process.

31.     In other words, raw Moringa Powder poses a high risk of being contaminated with microorganisms, such as salmonella, and the absence of steps taken to reduce microorganisms, such as employing a kill step, poses a higher risk to human health and safety when consumed or ingested.

32.     Raw Moringa Powder poses a high potential risk for contamination with microorganisms, such as salmonella, because of how it is grown, harvested, and transported.

33.     Raw Moringa Powder has high potential risk for contamination with microorganisms, such as salmonella, because of the processes used to produce raw Moringa Powder.

34.     Raw Moringa Powder can be treated with a kill-step to reduce potential risk of contamination with microorganisms, such as salmonella.

35.     Salmonella poses a danger to human health and safety when consumed or ingested.

36.     Despite Moringa Powder being a "high risk" ingredient and otherwise having a high risk of contamination with microorganisms, Rhema was contractually obligated under the Agreement to incorporate raw Moringa Powder into the Raw Meal as set forth in the specifications.

37.     Section 9.1 of the Quality Agreement provides that only raw materials from GOL designated and approved suppliers may be used by Rhema in the manufacturing process.

38.     On July 28, 2015, GOL informed Rhema that it had selected, designated and approved Tri-Iso Tryline LLC dba Baobab Foods ("Baobab") as the designated and approved supplier and vendor of the raw Moringa Powder.

39.     GOL was solely responsible for the selection, due diligence and vetting of approved raw material suppliers, including Baobab.

40.     Rhema had no involvement in the selection, due diligence or vetting of approved raw suppliers, including Baobab.

41.     GOL knew that raw Moringa Powder may contain microorganisms, including salmonella.

42.     GOL knew that that standard of care in the industry was to apply a kill step to raw Moringa Powder.

43.     GOL's written specifications required raw Moringa Powder be used in the Raw Meal.

44.     GOL was told by Baobab on April 16, 2015 that it had been told that the raw Moringa Powder which was supposed to come in at under 10,000 CFU/g total plate count had higher levels.

45.     GOL was told by Baobab on April 16, 2015 that "most moringa leaf processors around the world irradiate moringa or use UV or dry steam kill steps" because moringa leaf powder has higher total plate count levels.

46.     GOL was told by Baobab on April 16, 2015 that Baobab had been working on a few options to reduce the total plate count on the raw moringa powder it was supplying and had done a test-run using a dry steam process.

47.     GOL was told by Baobab on April 16, 2015 that GOL had the option to either 1) agree that the under 1 million CFU/g total plate count was acceptable and that Baobab would do their regular processes and not employ the dry steam process or 2) Baobab would employ the dry steam processing step, which is guaranteed to lower total plate count levels.

48.     In response, on April 16, 2015, GOL responded "We are used to high numbers for organic materials, so 1 million to GOL is totally acceptable."

49.     On April 16, 2015, Rhema asked GOL, "Just to be certain, GOL does not favor the "dry steam process, correct?"

50.     On April 17, 2015, GOL responded "You are correct. We don't want any type of processing.  Need to keep this formula 'raw.'"

51.     GOL knew that raw materials which contain levels of microorganisms may produce food poisoning or other disease if not pasteurized or otherwise adequately treated.

52.     GOL would not authorize Rhema or Baobab to dry steam, pasteurize or apply other kill-step processes to the raw Moringa Powder.

53.     GOL knew in April 2015 that the raw Moringa Powder it specified be used in its Raw Meal had high total plate count levels and accepted levels of 1 million CFU/g total plate count.

54.     Total plate count is used as an indicator of bacterial populations on a sample.

55.     Total plate count can be used to gauge sanitary quality, adherence to good manufacturing practices, and to a lesser extent, an indicator of safety.

56.     GOL provided written assurances to Rhema on April 16, 2015 that GOL uses other organic powders "that have a spec of 5 million for total plate count already. We are used to high numbers for organic materials, so 1 million to GOL is totally acceptable."

57.     GOL knew that by accepting raw Moringa Powder from Baobab with high total plate count levels it was accepting potential increased risk.

58.     By accepting raw Moringa Powder from Baobab with high total plate count levels it provided written authorization for changes in product specifications for Raw Meal.

59.     GOL provided written authorization in April 2015 for an increase in total plate count to 1,300,000 cfu/g.

60.     GOL was told by Baobab that the raw Moringa Powder it was supplying to Rhema had high counts of coliforms.

61.     GOL was told by Baobab on November 12, 2015 that a batch of the raw Moringa Powder it had produced was contaminated with E. Coli bacteria.

62.     E. Coli is commonly found in the lower intestine of warm blooded animals and their feces.

63.     Coliform is a bacteria.

64.     Coliform is an indicator organism used as a sign of quality or hygienic status in food and dietary supplements.

65.     Coliform is often present in the intestines of animals.

66.     As a safety indicator, coliform can serve as a surrogate for Salmonella but is easier and simpler to detect.

67.     The presence of coliform in a sample can indicate presence of fecal contamination.

68.     The presence of coliform in a sample can indicate a lapse in sanitation as required in the good manufacturing practices (GMPs) or a process failure.

69.     GOL knew that by accepting raw Moringa Powder with coliform it was accepting potential increased risk.

70.     By accepting raw Moringa Powder from Baobab with higher levels of coliform it provided written authorization for changes in the specifications.

71.     Before manufacture of the dietary supplement began, Baobab had informed GOL that it recommended running the raw Moringa Powder through a "kill step" – i.e. irradiating the powder or exposing it to high heats – to kill microorganisms or bacteria such as salmonella.

72.     Before manufacture of the dietary supplement began, GOL knew that merely testing raw Moringa Powder for the presence of microorganisms, such as salmonella, was not reasonably sufficient to ensure that Moringa Powder was free from the sort of contamination that would be harmful to human health and safety.

73.     Before manufacture of the dietary supplement began, GOL approved testing parameters that it knew were not reasonably sufficient to detect or prevent the sort of microorganism contamination that could be harmful to human health and safety, that is, GOL knew that, even when Rhema conducted all the tests as specified in the parties' contract, the final product nonetheless could contain the sort of contamination dangerous to human health and safety if consumed or digested.

74.     Before manufacture of the dietary supplement began, GOL knew that the only way to reasonably ensure that Moringa Powder was free from contamination was to run it through a "kill step."

75.     Before manufacture of the dietary supplement began, GOL knew that Baobab could not supply Moringa Powder that was free from the sort of contamination, such as salmonella, that posed a danger to human health and safety if consumed or ingested.

76.     Despite Baobab' warning and GOL's own knowledge that raw Moringa Powder carried a high risk of having contamination such as salmonella, GOL decided to include raw Moringa Powder sourced from Baobab in its dietary supplements so that GOL could market the dietary supplement as a "raw" food product.

77.     GOL solely was responsible for the decision to use raw Moringa Powder in the dietary supplement.

78.     GOL never disclosed to Rhema that raw Moringa Powder carried a high risk of the sort of bacterial contamination that posed a danger to human health and safety.

79.     GOL never disclosed to Rhema that the approved testing parameters were not reasonably sufficient to detect and/or prevent the sort of contamination that would be harmful to human health and safety, and Rhema otherwise had no knowledge of this before or during manufacture.

80.     GOL was solely responsible for the product formula and has full responsibility for safety.

81.     GOL was solely responsible for inclusion of raw Moringa Powder in its Raw Meal and has full responsibility for safety.

82.     GOL was solely responsible for mandating that the Moringa Powder not be pasteurized or treated with a kill step and has full responsibility for safety.

83.     Any implied warranty of merchantability was displaced by the express warranty that the goods will comply with the specifications for raw Moringa Powder.

84.     By including raw Moringa Powder in its Raw Meal, an ingredient known to contain levels of microorganisms that may produce food poisoning or other disease if not pasteurized or treated with a kill-step, and mandating that the Moringa Powder be raw, GOL assumed risk.

85.     Based on the relationship between GOL and Rhema, Rhema reasonably anticipated and expected that GOL would provide Rhema with all information material to the manufacture of the dietary supplement, including information concerning the safety of raw ingredients like Moringa Powder.

86.     From August 2015 through February 2016, Baobab sold and delivered to Rhema lots of raw Moringa Powder, which were allegedly contaminated with salmonella.

87.     Baobab provided Rhema with certificates of analysis attesting that the Moringa Powder was, among other things, free of salmonella.

88.     Contrary to the certificate of analysis provided by Baobab, the lot of Moringa Powder Baobab supplied was latently contaminated with salmonella.

89.     Rhema and its independent laboratory, Great Basin Laboratory, conducted a battery of tests on the Moringa Powder Baobab supplied.  All testing and analysis were performed according to contractual, industry and governmental standards.  None of the testing and analysis detected the salmonella contamination in the raw Moringa Powder.

90.     The nature of the salmonella contamination in the Moringa Powder from Baobab was not detectable by the specified quality control processes or any governmental or industry standards.

91.     The source of the salmonella contamination is raw Moringa Powder from Baobab (the "Contaminated Product").

92.     In or about February 2016, GOL revised the specifications for the Raw Meal to remove raw Moringa Powder as an ingredient.

93.     Rhema manufactured and delivered to GOL replacement Raw Meal product to replace the recalled Raw Meal product.

94.     A significant amount of unfinished and finished Raw Meal product incorporating the Contaminated Product remains at Rhema.

95.     Since February 2016, Rhema continued to supply Raw Meal to GOL under the revised specifications.

96.     Rhema performed its obligations under the Agreement.

97.     The Products furnished to GOL under the Agreement conform to their Finished Goods Specification and Packaging Specifications.

98.     The Products furnished to GOL comply with the Quality Agreement.

99.     The method of manufacturing of the Products furnished to GOL complied with 21 CFR Part 111.

100.    The Manufacturing Agreement states under Section I.2:

> GOL agrees to issue periodic purchase orders to RHEMA with the cumulative twelve-month total value of at least sixteen million dollars ($16,000,000 USD).

101.    The Manufacturing Agreement states under Section I.7:

> With regard to materials described in paragraph 6 above, GOL acknowledges that because of minimum package quantities or other reasons beyond Manufacturer's reasonable control, RHEMA may be required to order raw materials or packaging materials in excess of that required to fulfill accepted purchase orders on hand at any given time ("Excess Materials"). RHEMA shall not hold in inventory or issue blanket purchase orders for more than a three (3) month supply of any raw materials or packaging materials without the prior written approval of GOL.

102.    The Manufacturing Agreement states under Section I.8:

> In the event GOL changes any Formula, Process, Specification or Packaging Specification, or decreases or discontinues any Product, unless otherwise agreed in writing by RHEMA, GOL will purchase from RHEMA any Excess Materials that RHEMA does not reasonably expect will be used by RHEMA in the ordinary course of its business in the manufacture of any product for any of its customers in the three (3) months following such change or decrease or discontinuation in purchase of the Products.

103. The Manufacturing Agreement states under Section II.4:

RHEMA shall be responsible for securing and purchasing all raw materials from GOL designated and approved suppliers and vendors. RHEMA will purchase raw materials and components, provided that GOL fully assists with communication to raw material suppliers.

104. The Manufacturing Agreement states under Section V:

RHEMA shall invoice GOL for all products on the applicable PO on the delivery date, which is payable 30 days from invoice date. Provided there are no discrepancies between the delivery and the invoice, GOL shall make payments in the amounts shown on the invoice accompanying the Product within thirty (30) days of the date of invoice.

105. Rhema invoiced GOL for products delivered and GOL has not make payments in the amounts shown on the invoices within 30 days of the invoice.

106. On September 9, 2016, RHEMA invoiced GOL for excess materials and stranded inventory. The amount currently owing under the invoice is $357,302.87.

107. GOL did not make payments in the amounts shown on the September 9, 2016 invoice within 30 days of the date on the invoice.

108. Rhema invoiced GOL for replacement product delivered to GOL and GOL has not made payment within 30 days of the invoice. The amount currently owing under the invoice is $1,123,260.47.

109. As of October 2016, GOL owed Rhema over $2,656,850.92 USD for unpaid invoices($1,123,260.47 for product Rhema provided to GOL under GOL's moringa-free formula, plus; $357,302.87 for excess materials and stranded inventory, plus; $937,140.96 for work in process, plus; $1,060,869.48 for product that GOL voluntarily recalled, less; a credit of $821,722.86 that GOL did not tie to any particular invoice).

110.     The Agreement required GOL to make a minimum annual purchase of at least $16,000,000 USD.

111.     GOL only purchased $7,090,848 USD in product from Rhema.

112.     The Agreement required GOL to purchase $8,909,152 USD more in product from Rhema.

113.     GOL's purchases for the April 2016 to March 2017 year were less than half the agreed upon minimum annual purchase commitment.

114.     Rhema would not have entered into Agreement if GOL had not agreed to minimum annual purchase of at least $16,000,000 USD.

115.     As set forth on Rhema's invoices, GOL owes Rhema interest of 2% per month (26.8% annually) on all unpaid amounts.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

116.     Rhema realleges and incorporates by reference each and every allegation set forth in the Counterclaim as though restated and fully set forth herein.

117.     GOL has breached the Manufacturing Agreement and the Quality Agreement, including but not limited to the specific sections outlined herein.

118.     GOL has breached the Agreement, by among other things, refusing to pay invoices within thirty (30) days of receiving them.

119.     Without payment, Rhema has been unable to pay creditors for the supplies used to manufacture GOL's product.

120.     GOL breached its contract with Rhema by failing to meet the agreed upon minimum annual purchase commitment.

121.    As a result of GOL's breach of the Agreement, Rhema has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Breach of Duty of Good Faith and Fair Dealing

122.    Rhema realleges and incorporates by reference each and every allegation set forth in in the Counterclaim as though restated and fully set forth herein.

123.    At all times material hereto, GOL agreed to act in good faith and deal fairly with Rhema when it entered into the Agreement.

124.    Among other things, the Agreement required GOL to pay Rhema for each invoice within thirty (30) days of receiving each.

125.    The Agreement also required GOL to make a minimum annual purchase from Rhema of at least $16,000,000.

126.    In the absence of a reasonable basis for doing so, and with full knowledge and/or reckless disregard for the consequences, GOL failed and refused to compensate Rhema for the product and to meet its minimum purchase obligation.

127.    GOL knew that raw Moringa Powder supplied by Baobab in 2015 contained high total plate counts.

128.    GOL knew that Baobab recommended irradiating the raw Moringa Powder that it (Baobab) supplied for use in GOL's products.

129.    GOL knew that the reason why Baobab recommended irradiating the raw Moringa Powder was to kill microorganisms.

130. GOL knew that the testing parameters that it approved for the manufacture of a dietary supplement containing raw Moringa Powder were not reasonably sufficient to detect and/or prevent salmonella.

131. GOL instructed Rhema in writing that a kill-step was not be used on raw Moringa Powder and that the Moringa Powder was to be kept raw.

132. Had GOL authorized a kill-step to be used on the Moringa Powder the recall for salmonella contamination could have been prevented.

133. GOL has brought this action in breach of the implied duty of good faith and to deal fairly with Rhema.

134. As a result of GOL's breach, Rhema has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF ON COUNTERCLAIM

WHEREFORE, Rhema respectfully requests that judgment be entered against GOL as follows:

a. For the award of general and special damages in an amount to be determined at trial;

b. For the award of prejudgment interest and post-judgment interest as allowed by law;

c. For the costs and attorneys' fees; and

d. For such other and further relief as this Court may deem just and equitable under the circumstances.

DATED this 12th day of June, 2018

CHRISTENSEN & JENSEN, P.C.

s/Bryson R. Brown
Heather L. Thuet
Bryson R. Brown
*Attorneys for Defendant Rhema Health
Products Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2018, the foregoing **THIRD AMENDED ANSWER & COUNTERCLAIM** was filed electronically utilizing the CM/ECF system which sent notification of such filing to the following:

Alan C. Bradshaw
abradshaw@mc2b.com
Christopher M. Glauser
cglauser@mc2b.com
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, UT 84111

Jeffrey A. Simes
jsimes@goodwinlaw.com
Joanne M. Gray
jgray@goodwinlaw.com
Michael K. Murray
mmurray@goodwinlaw.com
Amanda K. Russo
arusso@goodwinlaw.com
GOODWIN PROCTER LLP
*Attorneys for Plaintiff Garden of Life, LLC*

Ryan P. Atkinson
ratkinson@strongandhanni.com
STRONG & HANNI, P.C.
*Attorneys for Tri-Iso Tryline, LLC dba Baobab Foods*

*s/Bryson R. Brown*