**MANNING CURTIS BRADSHAW**
**& BEDNAR PLLC**
Alan C. Bradshaw, #4801
abradshaw@mc2b.com
Christopher M. Glauser, #12101
cglauser@mc2b.com
136 East South Temple, Suite 1300
Salt Lake City, UT 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678

*Attorneys for Plaintiff/Counterclaim Defendant Garden of Life, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GARDEN OF LIFE, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>RHEMA HEALTH PRODUCTS INC.,<br><br>        Defendant. | **GARDEN OF LIFE, LLC'S MOTION FOR SUMMARY JUDGMENT ON RHEMA HEALTH PRODUCTS INC.'S COUNTERCLAIM AND MEMORANDUM OF LAW IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED** |
| RHEMA HEALTH PRODUCTS INC.,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>TRI-ISO TRYLINE, LLC dba BAOBAB FOODS,<br><br>        Third-Party Defendant. | Case No. 2:16-cv-01222-BSJ<br><br>Judge Bruce S. Jenkins |

Pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1, Plaintiff and Counterclaim Defendant Garden of Life, LLC ("GOL"), by and through undersigned counsel, submits this Motion for Summary Judgment on Rhema Health Products Inc.'s ("Rhema") Counterclaims for Breach of Contract (Claim I) and the Breach of the Duty of Good Faith and Fair Dealing (Claim II).

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................... 1

RELIEF SOUGHT AND GROUNDS THEREFOR ....................................................... 2

BACKGROUND ............................................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 3

SUMMARY JUDGMENT STANDARD........................................................................ 9

ARGUMENT ..................................................................................................................... 9

   I.    GOL IS ENTITLED TO SUMMARY JUDGMENT ON RHEMA'S BREACH OF
       CONTRACT COUNTERCLAIM ......................................................................9

   II.   GOL IS ENTITLED TO SUMMARY JUDGMENT ON RHEMA'S BREACH OF
       GOOD FAITH AND FAIR DEALING COUNTERCLAIM ...........................12

CONCLUSION.................................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Avatar Dev. Corp. v. De Pani Constr.*,
   834 So. 2d 873 (Fla. Dist. Ct. App. 2002) ............................................................................15

*Burger King Corp. v. Weaver*,
   169 F.3d 1310 ...........................................................................................................................13

*Centurion Air Cargo, Inc. v. United Parcel Service Co.*,
   420 F.3d 1146 (11th Cir. 2005) ......................................................................................... 13-14

*Colucci v. Kar Kare Auto. Group, Inc.*,
   918 So. 2d 431 (Fla. Dist. Ct. App. 2006) ...............................................................................9

*In re Suncoast Airlines, Inc.*,
   101 B.R. 350 (S.D. Fla. 1989) ................................................................................................10

*Managed Care Sols., Inc. v. Cmty. Health Sys., Inc.*,
   No. 10-60170-CIV, 2012 WL 12861133 (S.D. Fla. May 14, 2012),
   *report and recommendation adopted*, No. 10-60170-CIV,
   2012 WL 12861134 (S.D. Fla. June 4, 2012) ................................................................... 9-10

*Popular Bank v. R.C. Asesores Financieros, C.A.*,
   797 So. 2d 614 (Fla. Dist. Ct. App. 2001) ............................................................................10

*Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
   896 So. 2d 787 (Fla. Dist. Ct. App. 2005) ....................................................................... 12-13

*SEB S.A v. Sunbeam Corp.*,
   148 Fed. App'x774 (11th Cir. 2005) .......................................................................................9

*Thomas v. Avis Rent a Car*,
   408 F. App'x 145 (10th Cir. 2011) ...........................................................................................9

*Timberland Consol. P'ship v. Andrews Land & Timber, Inc.*,
   818 So. 2d 609 (Fla. Dist. Ct. App. 2002) .............................................................................11

*Tracfone Wireless, Inc. v. Simply Wireless, Inc.*,
   275 F. Supp. 3d 1332 (S.D. Fla. 2017) ..................................................................................15

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................................9

Restatement (Second) of Contracts § 374(1) ......................................................... 11-12

## INTRODUCTION

As this Court has already decided, Rhema materially breached the parties' Manufacturing Agreement and Quality Agreement (together, the "Agreements") by supplying GOL with *Salmonella*-contaminated powdered meal replacement product, Raw Meal.  That ruling (ECF No. 169) also necessarily dispenses with Rhema's remaining counterclaims.

Rhema's counterclaim that GOL breached the Agreements by failing to pay unspecified invoices and failing to fulfill its minimum purchase obligation fails because Rhema's prior material breach excused GOL's future performance and gave GOL the right to terminate the Agreements by their terms.  Settled Florida law provides that a party's material breach excuses future performance on the part of an injured party such as GOL.  In any event, Rhema cannot plausibly demand that GOL pay for its claimed "lost profits" resulting from its own wrongdoing or for the contaminated or even replacement products it supplied in an attempt to mitigate the consequences from its breach.

Rhema's counterclaim under the implied covenant of good faith and fair dealing is particularly untenable:  this claim seeks to relitigate this Court's finding that Rhema materially breached the agreements by suggesting—yet again—that GOL was somehow at fault for Rhema's breach because GOL supposedly prohibited Rhema from applying a "kill step" to eliminate potential pathogens.  But again, Rhema was found to have materially breached the Agreements, despite its vocal invocation of its "kill step" theory.  Presumably, the Court rejected these arguments because the Agreements specifically mandate an absence of *Salmonella*, charge Rhema with sole responsibility for the purity of the finished product, and give it control over supervising suppliers and testing protocols.  Rhema cannot use the implied covenant theory to rewrite the parties' contracts, and, in any event, the undisputed facts are clear that GOL never

prohibited Rhema or Tri-Iso Tryline LLC d/b/a Baobab Foods ("Baobab") from using a "kill step" on the moringa.

For these reasons, and as explained below, this Court should GOL grant summary judgment on Rhema's counterclaim in its entirety.

## RELIEF SOUGHT AND GROUNDS THEREFOR

GOL seeks a declaration and judgment dismissing Rhema's Counterclaims against GOL for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing in its entirety, as Rhema cannot maintain either counterclaim based on this Court's holding on July 12, 2018 that Rhema materially breached the parties' Manufacturing Agreement and Quality Agreement as a matter of law; that ruling necessarily implies that GOL was excused from further performance under the contract. GOL also is entitled to summary judgment on Rhema's breach of the duty of good faith and fair dealing counterclaim because Rhema's only other purported basis for this cause of action is not tied to any contractual obligation and is disproven by the undisputed evidence.

## BACKGROUND

GOL filed its Complaint seeking damages it incurred when it had to recall Raw Meal supplied by Rhema that was contaminated with and adulterated by *Salmonella* Virchow in material breach of the parties' Agreements. GOL's Compl. (ECF No. 2). GOL moved for partial summary judgment on its breach of contract and breach of implied warranty claims, which this Court granted in part, holding that Rhema materially breached its agreements with GOL. *See* Court's July 12, 2018 Order on Summary Judgment (ECF No. 169) ("July 12, 2018 Order"). In so ruling, the Court implicitly rejected Rhema's argument that GOL was at fault for the contaminated product by selecting raw moringa and/or allegedly preventing a "kill step."

However, Rhema brings a counterclaim against GOL, seeking damages from GOL, even though <u>Rhema</u> breached the Agreements. Rhema alleges, among other things, that GOL breached the Agreements by "refusing to pay invoices within thirty (30) days of receiving them" (Rhema's Third Amended Answer and Counterclaim ("TAAC") ¶ 118), and "failing to meet the agreed upon minimum annual purchase commitment," (TAAC ¶ 120).  Rhema also claims that GOL breached the duty of good faith and fair dealing on the same bases (despite asserting that the express terms of the contracts govern those matters) (TAAC ¶¶ 124-26), as well as by allegedly prohibiting Rhema from using a "kill step" on organic moringa oleifera ("moringa") (the source of the *Salmonella* that contaminated the Raw Meal Rhema supplied), despite its alleged knowledge that moringa powder supplied by Baobab "contained high total plate counts," (TAAC ¶¶ 127-33).[1]  Rhema alleges damages of lost profits and out-of-pocket costs, which purport to include unfinished and finished contaminated Raw Meal which was recalled (TAAC ¶¶ 94, 109), replacement Raw Meal that was produced with revised specifications (to omit potentially contaminated moringa) (TAAC ¶¶ 108, 109), "excess materials and stranded inventory" (TAAC ¶¶ 106, 109), and "work in process" (TAAC ¶¶ 106, 109).

The Court's conclusion that Rhema materially breached the Agreements precludes Rhema's counterclaims.  GOL therefore brings the instant Motion.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.     GOL and Rhema entered into the Manufacturing Agreement on January 22, 2015 (attached hereto as Appendix A).  *See* July 12, 2018 Order at ¶ 1.

---

[1] The "total plate count" refers to the number of aerobic organisms present in a substance.  This is not the same as a measure of the amount of pathogenic (or harmful) bacteria in that substance, like *Salmonella*.  The Agreements contemplate a permissible plate count; they prohibit <u>any</u> *Salmonella*.

2.      The Manufacturing Agreement incorporated and attached as an exhibit a Quality Agreement dated December 31, 2014 ("Quality Agreement") (attached hereto as Appendix B). *See* July 12, 2018 Order at ¶ 1.

3.      Pursuant to the Agreements, Rhema was obligated to "package and manufacture" health food and dietary supplements for GOL, including a powdered meal replacement product called Raw Meal Organic Shake and Meal Replacement ("Raw Meal"), for GOL's ultimate distribution.  *See id.* at ¶ 2; *see also* App. A, § 1; App. B at 1.

4.      The Agreements required that Rhema furnish products to GOL that would "fully conform to their Finished Goods Specifications and be pure and free from adulteration."  July 12, 2018 Order at ¶ 3; *see also* App. A, § IV(1).

5.      The "specifications [for the Raw Meal] required the use of raw moringa oleifera aka moringa leaf powder."  Rhema's TAAC ¶ 8.

6.      GOL's Specifications for Raw Meal required that Rhema supply a product free from *Salmonella* contamination.  *See* Raw Meal Specifications (ECF Nos. 114-1, 114-2, filed under seal).

7.      The Specifications for Raw Meal did not prohibit a "kill step" or heat treatment on any ingredients used in the Raw Meal, including raw moringa which ultimately was found to have contained the *Salmonella* pathogen that caused the contamination.  *Id.*

8.      The parties' Agreements made Rhema responsible for supervising suppliers and conducting testing protocols, among other aspects of controlling the procurement and processing of raw ingredients and the manufacture of Raw Meal.  *See, e.g.*, App. B, §§ 9.1, 9.3.1; App. B, Ex. A §§ 4d, 4h, 4i, 5b, 6b, 6d; *see also* App. A, §§ II(4), IV(1).

9.      Both GOL and Rhema approved Baobab as the supplier of the moringa for Raw Meal, and Rhema placed orders with Baobab for moringa.  *See* June 1, 2018 Dep. of Spencer Porter (Rule 30(b)(6) designee) ("Porter Dep.") Tr. 37:11-23 (attached hereto as Appendix C).

10.     Rhema did little to evaluate Baobab as a supplier; Rhema's Head of Quality, Spencer Porter, had no knowledge of whether Rhema ever sent Baobab a supplier questionnaire to evaluate it (*id.* at 46:9-47:8), spoke to anyone at Baobab (*id.* at 47:9-12), did any further research to determine whether it wanted to do business with Baobab (*id.* at 47:13-16), or engaged in any supplier audits or performance reviews (*id.* at 87:17-24).

11.     On April 14, 2015, Baobab informed Rhema and GOL that a total plate count measurement (though not *pathogenic* bacteria measurement) on certain lots of moringa was higher than Baobab had expected based on the specifications for the moringa.  *See* Exhibit 6 to Jan. 18, 2018 Dep. of Jeffrey Brams, at RHEMA00002334-36 (attached hereto as Appendix D).

12.     In this email exchange, Baobab informed a Rhema employee, Darren Auramenko, of potential options for manufacturing moringa powder for Raw Meal.  One of these options included not employing a dry steam processing step, which both Rhema and GOL found to be an acceptable way to move forward with manufacturing.  *See id.* at RHEMA00002334.

13.     Rhema was fully aware of the concept of a kill step when it first started doing business with Garden of Life.  *See* App. C, Porter Dep. Tr. 50:9-16; May 29, 2018 Dep. of Frank Wong (Rule 30(b)(6) designee) ("Wong Dep.") Tr. 55:21-24 (attached hereto as Appendix E).  It also knew to expect higher microbial levels on moringa powder as opposed to other ingredients because Rhema had classified the ingredient as a botanical.  *See* App. C, Porter Dep. Tr. 101:1-102:3; *see also* App. E, Wong Dep. Tr. 68:19-69:17.

5

14.     Rhema did not believe that a kill step was required for the moringa; if it had, its representatives testified that they would have recommended one to GOL.  App. C, Porter Dep. Tr. 65:21-66:3 ("Q.  It's fair to say that Rhema did not believe that a kill step was needed with respect to the Baobab Foods Moringa at that time? A. We had no test results to indicate such.  Q. If you thought a kill step had been needed for the Baobab Foods Moringa, you would have recommended that to Garden of Life, correct? A. Absolutely.").

15.     Rhema did not believe that the absence of a "kill step" made the product unreasonably dangerous.  *See* App. E, Wong Dep. Tr. 83:23-84:1 ("Q. But, sir, if there is a product that you believe is going to cause injury, you're not going to sell it even if the customer says I want it, are you?  A.  No, of course not."); App. C, Porter Dep. Tr. 134:1-15.  In fact, it was comfortable with the absence of a dry steam process based on the microbial limits on Baobab moringa.  App. E, Wong Dep. Tr. 85:3-7.

16.     According to Rhema's Director of Quality, Rhema did no independent investigation or research into moringa or to determine whether or not a kill step would be required to avoid contamination; it claims to have simply assumed that because GOL included moringa on a formula and its Raw Meal specification sheet, that it was appropriate to use.  App. C, Porter Dep. Tr. 55:2-56:22; *see also id.* at 99:5-12; 136:17-37:11.

17.     Rhema had previously recommended kill steps on other ingredients to GOL when it believed treatment was necessary.  *See id.* at 62:5-64:25.  And GOL never refused any request of Rhema to apply a "kill step." *See id.* at 66:8-15; Jan. 18, 2018 Dep. of Jeffrey Brams Tr. ("Brams Dep.") 239:24-41:23 (attached hereto as Appendix F); *see also* Exhibit 10 to Brams Dep. (attached hereto as Appendix G).

18.     To the contrary, on the few occasions Rhema raised the question of a "kill step" as to particular raw ingredients during the parties' relationship, GOL indicated that it supported such a treatment.  *See* App. C, Porter Dep. Tr. 62:5-63:23; Exhibit 9 to Porter Dep. (attached hereto as Appendix H); *see also* App. E, Wong Dep. Tr. 100:18-21 ("Q. Can you see – can you think of any example in which Rhema said, we think a kill step is appropriate or desirable and Garden of Life said no?  A. No.").

19.     Indeed, in or around November of 2015, when Baobab, the supplier of the raw moringa powder, suggested a "kill step" for moringa powder, GOL indicated that it supported this proposal.  *See* App. F, Brams Dep. Tr. 239:24-241:23; Exhibit 11 to Brams Dep. (attached hereto as Appendix I).

20.     Between approximately August or September 2015 and January 2016, Rhema manufactured and supplied lots of Raw Meal product to GOL.  *See* July 12, 2018 Order at ¶ 4.

21.     During this time, Rhema manufactured and supplied Raw Meal product to GOL that was contaminated with and adulterated by the pathogen *Salmonella* Virchow, which rendered the product unpure and adulterated.  *See id.* at ¶ 5.

22.     Rhema's supply of contaminated and adulterated Raw Meal forced GOL to implement a nationwide recall, pulling its flagship products out of hundreds of stores across the United States.   Sept. 27, 2018 Decl. of Jeffrey Brams in Opp. to Rhema's Mot. Summ. J. ("Brams Decl.") (attached hereto as Appendix J) at ¶ 3.

23.     The recall placed a core part of GOL's business in extreme jeopardy, as it opened up the prospect that retailers would no longer accept and promote GOL's products, or that competing products would exploit the recall and GOL's absence from shelves to take market share from GOL.  *Id.* at ¶ 6.

7

24.     Exhibit A to the Quality Agreement is the parties' Quality and Compliance Agreement Checklist, which "defines who is responsible for the Good Manufacturing Practice (GMP) aspects of specification development, manufacturing, testing and release of GoL products." App. B.  Section 12 of the Checklist deals with, among other things, "Product Recall" and "Market Withdrawal" and provides that GOL and Rhema both "shared" responsibility for "[i]nvestigation" and "[c]orrective action."  *Id.*

25.     Immediately after the recall, GOL and Rhema worked together to develop a plan of corrective action to address the crisis created by the recall, as required by Section 12 of Exhibit A to the Quality Agreement.  App. J,  Brams Decl., at ¶¶ 8-9.

26.     Specifically, GOL and Rhema created a moringa-free formulation of Raw Meal to eliminate the ingredient identified as the source of the contamination, and worked quickly to get replacement product on retail shelves to avoid customer complaints, brand and goodwill damage, and lost market share to competitors.  *Id.* at ¶ 9.

27.     Had GOL not immediately taken these actions, the damages could have totaled in the hundreds of millions, rather than the low tens of millions that GOL actually incurred.  *Id.*

28.     The parties' Manufacturing Agreement provided that:

> This Agreement shall be for three years, effective as of the Execution Date, and shall terminate three years thereafter, provided, however, that either party may terminate this Agreement at any time by written notice to the other if . . . either party breaches the terms of the Agreement and fails to cure such breach within 30 days from written notice of the breach by the non-breaching party.

App. A, § VII(a)(iv).

29.     GOL terminated the Agreements by a written notice dated September 26, 2016 in accordance with the termination provision of the Agreements.  GOL's Sept. 26, 2016 Notice of Termination (attached hereto as Appendix K).

8

30.     Because Rhema supplied products contaminated with and adulterated by *Salmonella*, this Court held, in its July 12, 2018 granting in part GOL's motion for summary judgment on its breach of contract claim, that Rhema was in material breach of its obligations under the parties' Agreements.  *See* July 12, 2018 Order.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment,' and, instead, summary judgment requires 'no *genuine* issue of *material* fact.'" *Thomas v. Avis Rent a Car*, 408 F. App'x 145, 151 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48) (alterations and emphasis in original).  Additionally, summary judgment may be granted as to all or part of any claim or defense.  *See* Fed. R. Civ. P. 56(a).

## ARGUMENT

### I.     GOL IS ENTITLED TO SUMMARY JUDGMENT ON RHEMA'S BREACH OF CONTRACT COUNTERCLAIM

GOL is entitled to summary judgment on Rhema's breach of contract counterclaim because Rhema's prior material breach excused GOL's performance.  In Florida, "the general rule is that a material breach of [a contract] allows the non-breaching party to treat the breach as a discharge of his contractual liability." *Colucci v. Kar Kare Auto. Group, Inc.*, 918 So. 2d 431, 437 (Fla. Dist. Ct. App. 2006) (quoting *Benemerito & Flores, M.D.'s, P.A. v. Roche, M.D.*, 751 So. 2d 91, 93 (Fla. Dist. Ct. App. 1999)).[2]  As such, "[w]here there is a prior breach by the

---

[2] *See also SEB S.A v. Sunbeam Corp.*, 148 Fed. App'x. 774, 787 (11th Cir. 2005) ("Florida law states that '[w]hen a contract is breached by one of the parties, the other party is released from any obligation to perform the contract.'" (quoting *Miller v. Reinhart*, 548 So. 2d 1174, 1175 (Fla.

complaining party, the breach is a defense to the contract action." *Managed Care Sols., Inc. v. Cmty. Health Sys., Inc*., No. 10-60170-CIV, 2012 WL 12861133, at *6 (S.D. Fla. May 14, 2012), *report and recommendation adopted*, No. 10-60170-CIV, 2012 WL 12861134 (S.D. Fla. June 4, 2012) (citing *SEB S.A v. Sunbeam Corp.*, 148 Fed. App'x 774, 787 (11th Cir. 2005)).[3] Accordingly, once Rhema materially breached the Agreements by supplying contaminated and adulterated Raw Meal (*see* July 12, 2018 Order), GOL was under no obligation to pay for the defective and dangerous product, or to continue to purchase product from Rhema pursuant to the Agreements.  Thus, Rhema's breach of contract claim is barred.

Not only does the first-to-breach doctrine bar Rhema's counterclaim, but so does the Manufacturing Agreement itself.   Section VII of the Manufacturing Agreement expressly contemplates one party's termination of the parties' Agreement upon notice of the other parties' breach.  This is precisely what happened here.  In accordance with that provision, and applicable Florida statutes, GOL timely and appropriately invoked its right to terminate the Manufacturing Agreement in its September 26, 2016 Notice to Rhema.   App. K.   Rhema therefore has no actionable breach of contract counterclaim against GOL.  This formal termination of the parties' Agreement operates, in particular, to bar any claim to lost profits for the duration of the three-year term of the Agreement.  It is clear that early termination of this term due to breach was expressly contemplated by the parties in the formation of their Agreement, as reflected in Section

---

Dist. Ct. App. 1989))); *In re Suncoast Airlines, Inc.*, 101 B.R. 350, 355 (S.D. Fla. 1989) ("The non-breaching party to a contract has no duty to further perform the contract.").

[3] *See also Popular Bank v. R.C. Asesores Financieros, C.A.*, 797 So. 2d 614, 622 (Fla. Dist. Ct. App. 2001) ("Upon [Appellant]'s material breach of the [Agreement]. . ., [Appellee] was excused as a matter of law from complying . . ."); *Cheezem Dev. Corp. v. Intracoastal Sales & Serv., Inc.*, 336 So. 2d 1210, 1212 (Fla. Dist. Ct. App. 1976) ("As the party who initially committed a substantial breach of the contract, [Appellee] was not entitled to avail itself of a claimed subsequent breach by [Appellant].").

VII(a)(iv).  Rhema cannot now ignore this provision to claim lost profits for years to which it is not entitled.

To the extent the breach of contract counterclaim arises out of any purported failure to pay invoices for product Rhema provided to GOL with GOL's moringa-free formula, excess materials and stranded inventory, work in process, and product that GOL voluntarily recalled, the claim fails as a matter of law.  Rhema has failed to sufficiently substantiate these claims with direct, admissible evidence, and, in any event, these purported expenses were incurred as a direct result of Rhema's own breach and as part of an effort to mitigate the same.  Rhema cannot now recover the costs associated with its own wrongdoing.

Even if Rhema could somehow substantiate this aspect of its breach of contract claim, the damages it seeks are barred by law because they are far less than the damages suffered by GOL as a result of Rhema's breach.[4]  Where a breaching party seeks restitution[5] for benefits allegedly conferred, any such recovery is limited to what is "in excess of the loss that [it] has caused by [its] own breach."  Restatement (Second) of Contracts § 374(1); *see also Timberland Consol. P'ship v. Andrews Land & Timber, Inc.*, 818 So. 2d 609, 611 (Fla. Dist. Ct. App. 2002) ("Generally, if a party to a contract justifiably refuses to perform on the ground that the party's

---

[4] Rhema seeks a total of approximately $5,470,843 in damages ($4,776,607 in alleged lost profits and $694,236 in alleged out-of-pocket costs) (Rhema's Aug. 20, 2018 Mot. Summ J. at ¶¶ 11-12, 14-16  (ECF No. 175)), whereas GOL seeks approximately $11,491,971 in compensatory damages and other costs.

[5] Rhema argues in its Reply in Support of its Motion for Summary Judgment (ECF No. at 18) that this section of the Restatement is not applicable because its damages sound in *breach of contract* and not *restitution*.  However, no matter how Rhema attempts to characterize its damages, the very point here is that Rhema, as the first party to materially breach the parties' Agreements, cannot generally enforce the Agreements and is not entitled to recover under it.  *See* pp. 9-10 *infra*.  As a result, Rhema can *only* be making a claim for restitution, not lost profits. *Cf. Timberland Consol. P'ship*, 818 So. 2d at 611 (explaining that party in breach may be entitled to restitution which the court characterizes as "extracontractual").

remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit he has conferred by way of part performance in excess of the loss that he has caused by his own breach." (citing *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller*, 629 So. 2d 947 (Fla. Dist. Ct. App. 1993) (quoting Restatement (Second) of Contracts § 374(1) (1979))).  As Comment (a) to § 374(1) clarifies, "[t]he party in breach is, in any case, liable for the loss caused by his breach.  If the benefit received by the injured party does not exceed that loss, he owes nothing to the party in breach."  Here, Rhema's material breach directly resulted in nearly $11.5 million in out-of-pocket losses to GOL, plus millions more in consequential damages.  Whatever benefit Rhema claims to have conferred on GOL comes nowhere close to exceeding the loss that Rhema caused.  Rhema therefore cannot recover under breach of contract for damages it caused as a matter of law.[6]

Accordingly, GOL is entitled to summary judgment on Rhema's breach of contract counterclaim in its entirety.

## II.   GOL IS ENTITLED TO SUMMARY JUDGMENT ON RHEMA'S BREACH OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM

Rhema's counterclaim invoking the implied covenant of good faith and fair dealing also fails as a matter of law for the reasons below.  Under Florida law, the objective of the implied covenant claim is "to protect the reasonable expectations of the contracting parties[.]" *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001).  "Because the implied covenant is not a stated contractual term, to operate it attaches to the performance of a specific or express contractual provision." *Snow v. Ruden, McClosky,*

---

[6] Rhema should also be denied the damages it seeks for the reasons set forth in GOL's Opposition to Rhema's Motion for Summary Judgment on Its Claim for Breach of Contract Against GOL (ECF No. 192, Section B at 19-24), the entirety of which GOL adopts and incorporates herein by reference.

*Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. Dist. Ct. App.  2005).  Moreover, the implied covenant of good faith and fair dealing cannot be used to alter a contract's express obligations.  *See, e.g.*, *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (The Florida appellate courts have also held that "[t]he implied obligation of good faith cannot be used to vary the terms of an express contract." (quoting *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. Dist. Ct. App. 1997)).

As an initial matter, Rhema attempts to use its implied covenant claim, like it does with its breach of contract claim, to (again) seek to hold GOL liable for alleged violations of contractual provisions.  *See* TAAC ¶ 126 (payment of certain invoices and minimum product purchases).  However, as discussed above, GOL was excused from further fulfilling any of its obligations under the contract following Rhema's material breach of that contract.  Indeed, the Manufacturing Agreement expressly reflected the parties' expectation that the Agreement may be terminated by a party at any time due to the other parties' breach of the Agreement—as GOL did.  *See* App. A, § VII(a)(iv).  A breach of the implied covenant of good faith and fair dealing cannot be maintained "where no enforceable executory contractual obligation remains."  *Ins. Concepts & Design, Inc.*, 785 So. 2d at 1235 (internal quotations and citation omitted). Accordingly, GOL performed the Agreement in good faith and is entitled to summary judgment on Rhema's claim on this basis.

Rhema further attempts to hold GOL liable on the basis of Rhema's allegations concerning the quality and processing of Baobab moringa—specifically, that GOL prevented Rhema from applying a "kill step" to prevent contamination.  However, Rhema has not alleged any express contractual provision GOL has breached in allegedly preventing the "kill step," as required by Florida law.  *See, e.g.*, *Centurion Air Cargo, Inc. v. United Parcel Service Co.*, 420

F.3d 1146, 1151-52 (11th Cir. 2005) ("[A] breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract.").   Quite to the contrary, the express terms of the Agreements place on Rhema the responsibility for measures to ensure the purity of raw ingredients and the final product, to supervise raw ingredient suppliers, and to manage testing protocols.   Specifically, Rhema agreed to secure and purchase the raw materials" (App. A, § II(4)) and to "maintain supplier quality program that encompasses supplier qualification, audits, and supplier performance" (App. B, § 9.1).   Rhema also agreed to "take the necessary steps to ensure the manufacturing process is in control, including Supplier Qualification."   App. B, § 9.3.1.   Moreover, Exhibit A to the Quality Agreement reflects that Rhema had "full" responsibility—and GOL had "none"—to, among other things, perform a "[s]upplier audit" (Quality Agreement, Ex. A at § 6b) and "[m]onitor supplier performance" (*id.* at § 6d), as well as for "[s]ampling plans" (*id.* at § 5b), "[l]aboratory reference standards" (*id.* at § 4h), "[t]est method qualification" (*id.* at § 4d), and "Out of Specification procedures" (*id.* at § 4i).   Neither the Agreements nor the specifications for Raw Meal prohibited the use of a kill step.[7]   And, while knowing it had full control over the manufacture of the product, Rhema also expressly warranted it would supply product that was "pure and free from adulteration."   App. A, § IV(1).   Given the foregoing, it is utterly implausible to claim that Rhema was prevented—indeed, that GOL prohibited it—from employing any necessary manufacturing, processing, or quality controls on Raw Meal or its ingredients to ensure product safety or purity.   Through its allegations suggesting the contrary, Rhema improperly attempts to modify the parties' Agreements and alter the express contractual bargain of the parties, under which Rhema assumed sole responsibility for procurement of raw ingredients, testing and manufacture of Raw Meal, as well as its ultimate purity.   But Rhema

---

[7] *See* Raw Meal Specifications (ECF Nos. 114-1, 114-2, filed under seal).

14

cannot now claim breach of "an implied covenant of good faith . . . to vary the unambiguous terms of a written contract and when parties negotiate 'a fully specified, unambiguous contract, [a] court is not at liberty to change their bargain.'"  *Avatar Dev. Corp. v. De Pani Constr.*, 834 So. 2d 873, 876 (Fla. Dist. Ct. App. 2002) (citation omitted).  Such a claim is prohibited under Florida law.  *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 275 F. Supp. 3d 1332, 1343 (S.D. Fla. 2017) (explaining that there can be no breach of good faith and fair dealing claim "where application of the covenant would contravene the express terms of the agreement").

Even if Rhema's contention did not fail on the face of the agreements, it cannot controvert its own Rule 30(b)(6) designees, who conceded that Rhema did <u>not</u> think a kill step necessary and who confirmed that GOL never refused to permit one.  Spencer Porter, Rhema's Director of Quality, testified as follows:

> Q.      It's fair to say that Rhema did not believe that a kill step was needed with respect to the Baobab Foods Moringa at that time?
>
> A.      We had no test results to indicate such.
>
> Q.      If you thought a kill step had been needed for the Baobab Foods Moringa, you would have recommended that to Garden of Life, correct?
>
> A.      Absolutely.

App. C, Porter Dep. Tr. 65:21-66:3.  Making matters much worse for Rhema, its Vice President of Product Development and Technical Services, Frank Wong, admitted in his Rule 30(b)(6) deposition that he could think of no example in which Rhema requested or suggested a "kill step" and GOL refused.  App. E, Wong Dep. Tr. 100:18-21.  Rhema's "kill step" argument has always been a sham; that it would press the argument after its own witnesses have conceded the core point is inexplicable.

The other evidence in this case overwhelmingly closes the door on the "kill step"

15

argument, leaving no disputed fact.  For example, in one email chain from November 2015, the parties discussed "some recent microbial issues on a few batches of raw moringa leaf powder." App. I at RHEMA00003643-3645.   Copied on this email chain was Darren Auramenko, Rhema's buyer.  *Id.*  Mr. Auramenko was also copied on an earlier email chain from April 2015, which discusses the "microbial levels" in the moringa, which Mr. Auramenko ultimately forwarded to Spencer Porter, Rhema's former Director of Quality & Compliance.  *See* App. D. In none of these emails did anyone from GOL indicate that a "kill step" was prohibited. Furthermore, on the limited occasions that Rhema requested the use of a kill step, no one from GOL prohibited that option.[8]  Indeed, during his 30(b)(6) deposition, Spencer Porter, Rhema's corporate representative, testified that <u>GOL never prohibited a kill step</u>.  App. C, Porter Dep. Tr. 66:8-15.  Even if the application of a kill step had been prohibited, Rhema has not established, and cannot establish, that the *Salmonella* contamination would have been prevented if a kill step (specifically, a dry steam treatment) had been employed.

The undisputed facts show that the allegations in Rhema's counterclaim are false, and GOL is entitled to summary judgment on Rhema's breach of the duty of good faith and fair dealing counterclaim.

---

[8] *See* App. C, Porter Dep. Tr. 62:5-63:23, 66:8-15; App. E, Wong Dep. Tr. 100:18-2; App. H; *see also* App. G at Tri-Iso00000270.

## CONCLUSION

For the foregoing reasons, GOL respectfully requests that this Court grant GOL's Motion for Summary Judgment on Rhema's Counterclaim in its entirety.

Dated: November 7, 2018

Respectfully submitted,

MANNING CURTIS BRADSHAW
& BEDNAR PLLC


/s/ Christopher M. Glauser
Alan C. Bradshaw
Christopher M. Glauser

Jeffrey A. Simes (*pro hac vice*)
Joanne M. Gray (*pro hac vice*)
Michael K. Murray (*pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Phone: (212) 813-8800
Fax: (212) 355-3333
JSimes@goodwinlaw.com
JGray@goodwinlaw.com
MMurray@goodwinlaw.com

Amanda H. Russo (*pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue N.W.
Washington, DC  20001
Phone: (202) 346-4000
Fax: (202) 346-4444
ARusso@goodwinlaw.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Garden of Life, LLC*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing **GARDEN OF LIFE, LLC'S MOTION FOR SUMMARY JUDGMENT ON RHEMA HEALTH PRODUCTS INC.'S COUNTERCLAIM AND MEMORANDUM OF LAW IN SUPPORT** to be served in the method indicated below to the below-named parties this 7th day of November, 2018.

| | |
|---|---|
| \_\_\_HAND DELIVERY<br>\_\_\_U.S. MAIL<br>\_\_\_FAX TRANSMISSION<br>\_\_\_E-MAIL TRANSMISSION<br> x  CM/ECF | Heather L. Thuet<br>Bryson R. Brown<br>CHRISTENSEN & JENSEN, P.C.<br>257 East 200 South, Suite 1100<br>Salt Lake City, UT 84111<br>Heather.Thuet@chrisjen.com<br>Bryson.Brown@chrisjen.com<br><br>*Attorneys for Defendant/Counterclaim Plaintiff Rhema Health Products, Inc.*<br><br>Ryan Atkinson<br>STRONG & HANNI<br>102 South 200 East, Suite 800<br>Salt Lake City, UT 84111<br>ratkinson@strongandhanni.com<br><br>*Attorney for Third-Party Defendant Tri-Iso Tryline, LLC  dba Baobab Foods* |

/s/ Christopher M. Glauser